822 F.2d 1268
 56 USLW 2056, Prod.Liab.Rep.(CCH)P 11,550
 Julie Beth URLAND, an infant By and Through William Charles
URLAND and Chloe Jill Urland, her natural
guardians, and William Charles Urland
and Chloe Jill Urland,
individually, Appellants,
v.
MERRELL-DOW PHARMACEUTICALS, INC.
 No. 86-1623.
 United States Court of Appeals,
Third Circuit.
 Argued April 6, 1987.
Decided June 24, 1987.
Rehearing and Rehearing In Banc Denied July 17, 1987.
 
 W. David Allen (argued), Allen T. Eaton, Allen T. Eaton & Associates, Washington, D.C., Frank M. McClellan, Temple University School of Law, Philadelphia, Pa., for appellants.
 Frank C. Woodside, III (argued), John E. Schlosser, K.C. Green, Kathleen W. Kolodgy, Janet G. Abaray, Dinsmore & Shohl, Cincinnati, Ohio, James M. Beck, Edward W. Madeira, Nina M. Gussack, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellee.
 Before SLOVITER and BECKER, Circuit Judges, and FISHER, District judge.*
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 Dismissal of an action on the grounds of the statute of limitations is particularly anguishing when the victim is a minor, the injury grievous, and the alleged wrongful act repellent, if true. See O'Brien v. Eli Lilly & Co., 668 F.2d 704, 712 (3d Cir.1982) (Sloviter, J., concurring). Nonetheless, we are obliged to follow the applicable legal principles. Certainly a federal court sitting in diversity is not free to impose its notions of equity on state courts or on a state legislative body. We will affirm the entry of judgment for defendant in this case because we believe that Pennsylvania law requires us to do so.
 
 I.
 
 2
 Julie Beth Urland and her parents William and Chloe Urland filed suit against Merrell-Dow Pharmaceuticals, Inc., the manufacturer of Bendectin, contending that Mrs. Urland's ingestion of Bendectin while pregnant was the cause of Julie's birth defects. Julie was born on February 8, 1972, with part of her left arm missing. This diversity action was filed on October 7, 1981 against Merrell-Dow in the United States District Court for the Eastern District of Pennsylvania. Merrell-Dow pled the two year Pennsylvania statute of limitations as a defense. The court bifurcated the statute of limitations issue, presenting that issue to the jury as a threshold matter.
 
 II.
 
 3
 Following Julie's birth, the Urlands suspected that Mrs. Urland's ingestion of Bendectin might have been the cause of Julie's birth defects and Mrs. Urland made various inquiries. In 1972, Mrs. Urland contacted several of her treating physicians, the March of Dimes, and the Food and Drug Administration. In her letter to the FDA, she stated that she had taken Bendectin "at the approximate time when the limb buds [were] being formed" and referred to "the questions and doubts" she had concerning this medication. App. at 391. Copies of this letter were sent to the Hon. Hugh Scott of Pennsylvania and Merrell-Dow, then Merrell-National Laboratories Division of Richardson-Merrell, Inc.
 
 
 4
 The FDA responded that it would refer the letter to the physicians who monitor adverse drug experience, and requested that Mrs. Urland's physician complete the Drug Experience Report which it enclosed. Apparently, this was not done. Senator Scott wrote that he was referring the letter to the appropriate authorities.
 
 
 5
 Merrell-Dow also responded by letter from Richard H. O'Dillon, M.D., Director of the Product Development Clinical Research Group who stated that the letter was written for the purpose of "reliev[ing] your mind about your use of Bendectin during pregnancy." App. at 394. Dr. O'Dillon described various animal and human tests purportedly showing that Bendectin was not an agent having the potential for causing malformations and stated his "belief, that your child's malformation is unrelated to Bendectin ingestion." App. at 394. The Urlands claim that as a result, they did not sue Merrell-Dow at that time. Nevertheless, the Urlands continued to harbor suspicion that Bendectin was the cause of Julie's birth defects and discussed the possibility of bringing a lawsuit against Merrell-Dow.
 
 
 6
 In early September 1979, the Urlands were contacted by telephone by a reporter from the National Enquirer who stated that Mrs. Urland's letters had come to light in a trial in Florida involving Bendectin and birth defects. After the phone call Mrs. Urland told her husband about the Florida suit and the allegation made there that Bendectin caused birth defects. Mrs. Urland agreed to meet with the reporter and at that meeting told him that she was suspicious that Bendectin caused Julie's birth defects. Mrs. Urland also agreed to allow a picture of herself and Julie to be used in an article concerning Bendectin to be published by the Enquirer. The front page headline on the National Enquirer dated October 9, 1979 stated "New Thalidomide-Type Scandel--Experts Reveal ... COMMON DRUG CAUSING DEFORMED BABIES." App. at 397. The article quoted various medical sources as stating that Bendectin could cause birth defects, and described various cases of babies born with birth defects from mothers who had taken Bendectin during their pregnancy. The article also described an alleged coverup by Merrell-Dow of the test results indicating possible teratogenicity. The Urlands testified that they were not certain exactly when they purchased a copy of the National Enquirer edition containing their story, although Mr. Urland testified that he thought that he had purchased a copy on October 9, 1979, less than two years before the filing of the present lawsuit. However, he admitted he might have used that date because it appears on the newspaper. Mrs. Urland testified that she had since become aware that the edition dated October 9, 1979 hit the newsstands on October 2, 1979, and went off the newsstands on October 9, 1979.
 
 
 7
 It is clear that the interview with the reporter took place in September 1979, that at the time of the reporter's phone call Mrs. Urland became aware of the Florida trial alleging a connection between Bendectin and birth defects, and that this information revived her suspicion about Bendectin being a possible cause of Julie's birth defects.
 
 III.
 
 8
 The applicable statute of limitations is set forth in 42 Pa.Cons.Stat.Ann. Sec. 5524(2), which states that an action to recover damages for personal injuries must be commenced within two years. However, the Pennsylvania Supreme Court recognizes an exception to the statute, asserted by the Urlands before the district court, which delays the running of the statute until the plaintiff knew, or through the exercise of reasonable diligence should have known, of the injury and its cause. Ayers v. Morgan, 397 Pa. 282, 292, 154 A.2d 788, 793 (1959). See also Pocono International Raceway, Inc. v. Pocono Produce, Inc., 503 Pa. 80, 85, 468 A.2d 468, 471 (1983).
 
 
 9
 In a recent explication of the discovery rule, the Pennsylvania Superior Court has set forth the applicable standard as whether "the plaintiff knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." Cathcart v. Keene Industrial Insulation, 324 Pa.Super. 123, 136-37, 471 A.2d 493, 500 (1984) (in banc) (footnote omitted). The Cathcart standard has been widely adopted by Pennsylvania courts, see, e.g., Wheeler v. Johns-Manville Corp., 342 Pa.Super. 473, 476-77, 493 A.2d 120, 122 (1985), and has likewise been applied in decisions of this court. See, e.g., Cowgill v. Raymark Industries, Inc., 780 F.2d 324, 330 (3d Cir.1986).
 
 
 10
 The Urlands relied in addition upon the equitable rule that a defendant will be estopped from asserting the statute of limitations if through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry. Nesbitt v. Erie Coach Co., 416 Pa. 89, 92, 204 A.2d 473, 475 (1964). See also Ciccarelli v. Carey Canadian Mines Ltd., 757 F.2d 548, 556 (3d Cir.1985). A party relying on this doctrine will be entitled to a tolling of the statute of limitations by proving that there has been either intentional or unintentional deception by the defendant. Nesbitt, 416 Pa. at 96, 204 A.2d at 475-76. See also Ciccarelli, 757 F.2d at 556. The district court accepted arguendo the Urlands' position that Merrell-Dow concealed the potential claim, and it instructed the jury, over Merrell-Dow's objection, to assume for purposes of the statute of limitations phase of the case that the 1972 letter written by Dr. O'Dillon to the Urlands was inaccurate and misleading.[1] By assuming the existence of fraudulent concealment, the district court concluded that the issue of whether the Urlands were time-barred hinged solely on whether they knew or should have known prior to October 7, 1979 that Bendectin was the operative cause of Julie's birth defect.
 
 
 11
 The jury was given the following interrogatory:
 
 
 12
 Have Mr. and Mrs. Urland proved by a preponderance of the evidence that neither of them knew, or exercising reasonable diligence should have known, before October 7, 1979, that Bendectin was an operative cause of Julie Beth Urland's birth defect as alleged in their complaint?
 
 
 13
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 14
 (A "Yes" answer is in favor of Mr. and Mrs. Urland. A "No" answer is in favor of Merrell Dow Pharmaceuticals, Inc., and will terminate the case.)
 
 
 15
 The jury responded "no" to the interrogatory, and the district court entered judgment in favor of Merrell-Dow. The Urlands appeal, challenging various rulings of the district court.
 
 IV.
 Fraudulent Concealment
 A.
 
 16
 The Urlands' principal argument on appeal is that the district court failed to appreciate the differences in the effect on the statute of limitations between the discovery rule and fraudulent concealment. They concede that under the discovery rule, the statute of limitations begins to run when plaintiffs knew or using reasonable diligence should have known of the claim. They contend, however, that under the fraudulent concealment doctrine, which they also term "the doctrine of estoppel," the "defendant is 'stopped' from raising the defense of the statute of limitations until such time as the plaintiff has actual knowledge of the fraudulent activity and the true nature of the events." Reply Brief at 4 (emphasis in original). Although it is questionable whether the Urlands preserved this argument in the district court,[2] we reach the merits of the argument because it may touch upon plaintiffs' objection that they were entitled to a separate instruction regarding the effect of fraudulent concealment on Merrell-Dow's statute of limitations defense.
 
 
 17
 We reject at the outset the Urlands' extreme contention, which was reflected in the only written request for jury instruction on this issue that they submitted to the court, that Merrell-Dow was not entitled to use the statute of limitations defense at all. Plaintiffs cite as authority the language of this court's opinion in Ciccarelli v. Carey Canadian Mines, Ltd., 757 F.2d 548, 556 (3d Cir.1985), where, in an expansive discourse on the statute of limitations, we stated, "if through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry, the defendant is estopped from invoking the bar of limitation of action." Because we were concentrating in Ciccarelli on what constitutes fraudulent concealment and we concluded that there was no fraudulent concealment in that case, we may not have honed the dictum on which plaintiffs rely as carefully as we should have. It is evident from the Pennsylvania cases cited in Ciccarelli that we did not suggest, as plaintiffs argue, that the defendant would never be able to use the statute of limitations as a defense if there had been fraudulent concealment. Those cases either failed to address the question of whether a defendant, once estopped, would ever later be able to invoke the statute of limitations, see Gravinese v. Johns-Manville Corp., 324 Pa.Super. 432, 441-42, 471 A.2d 1233, 1238 (1984); McNair v. Weikers, 300 Pa.Super. 379, 388-89, 446 A.2d 905, 909 (1982), or resolved the issue adversely to the Urlands. See Nesbitt, 416 Pa. at 96, 204 A.2d at 477; Schaffer v. Larzelere, 410 Pa. 402, 405-06, 189 A.2d 267, 270 (1963). Thus, we agree with the district court that "the mere fact that there's fraud does not mean that the statute is always gone. It only means that it's tolled until the effects of the fraud have been nullified by knowledge to the plaintiff." App. at 187.
 
 
 18
 We turn instead to the question of when, under Pennsylvania law, the statute of limitations begins to run when fraudulent concealment has been shown or, as in this case, assumed to have been shown. No Pennsylvania case suggests that the reasonable diligence standard applied to the tolling of the statute of limitations for purposes of the discovery rule is not also applicable when the plaintiff relies on fraudulent concealment for tolling. Although there is language in Pennsylvania cases that speaks of the statute being tolled "until actual knowledge arises," see Schwab v. Cornell, 306 Pa. 536, 540, 160 A. 449, 450 (1932), those cases were decided without reference to the distinction now under consideration. For example, in Schwab the plaintiff brought suit against a conveyancer who failed to inform him of the evidence of certain unpaid taxes and instead advised him that the title was entirely clear of liens with one exception. The Court held the statute was tolled until plaintiff discovered the actual situation by receiving notice that his property had been sold for the unpaid taxes. Under these circumstances, there was no need to discuss reasonable diligence. Again, the "actual knowledge" language taken from Schwab was used in Nesbitt v. Erie Coach Co., 416 Pa. at 96, 204 A.2d at 477 (1964), but that was another case where there appears to have been no basis in the facts to discuss the reasonable diligence standard.
 
 
 19
 It is evident from the Pennsylvania cases, however, that the Supreme Court of that state views tolling of the statute of limitations in terms of the same "knew or should have known" standard whether the statute is tolled because of the discovery rule or because of fraudulent concealment. For example, in the leading case of Smith v. Blachley, 198 Pa. 173, 47 A. 985 (1901), the Court stated, "in general ... in cases of fraud the statute runs only from discovery, or from when, with reasonable diligence, there ought to have been discovery." Id. at 175, 47 A. at 985.
 
 
 20
 The general rule was reiterated in Deemer v. Weaver, 324 Pa. 85, 187 A. 215 (1936), where the Court, in finding that the defendant had concealed her fraud upon the plaintiffs and that the plaintiffs were not otherwise put on notice, stated:
 
 
 21
 If by any act of concealment or deceit, whether before or at the same time or after the act is committed, the wrongdoer hides from the innocent party the facts which would put him upon inquiry, the statute does not begin to run.
 
 
 22
 Id. at 88, 187 A. at 216. The Court further stated:
 
 
 23
 There are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence.
 
 
 24
 Id. at 90, 187 A. at 217 (quoting Maul v. Rider, 59 Pa. 167, 171 (1868)). Similar "reasonable diligence" language was used in Schaffer v. Larzelere, 410 Pa. 402, 406, 189 A.2d 267, 270 (1963) ("if it is true ... that the defendants deliberately concealed the facts incident to the cause of decedent's death and that the plaintiff could not through the use of reasonable diligence have ascertained these facts, this would bar the defendants from invoking the defense of the statute.") See also Ebbert v. Plymouth Oil Co., 348 Pa. 129, 137, 34 A.2d 493, 497 (1943); Barr v. Luckenbill, 351 Pa. 508, 513, 41 A.2d 627, 629 (1945).
 
 
 25
 In any event, this court already has had occasion to consider the applicable rule under Pennsylvania law in a civil rights case where the plaintiff claimed that the defendant county and various of its officials were estopped from asserting the statute of limitations because of their actions in concealing the circumstances of the plaintiff's decedent's death while in police custody. See Swietlowich v. County of Bucks, 610 F.2d 1157 (3d Cir.1979). We stated: "Pennsylvania courts hold that the limitation period does not commence in cases of fraudulent concealment until the time of discovery or the date when with reasonable diligence one would have been led to discovery." Id. at 1162 (emphasis added). This was consistent with our prior reading set forth in Williams v. Pittsburgh Terminal Coal Corp., 62 F.2d 924 (3d Cir.), cert. denied, 289 U.S. 749, 53 S.Ct. 692, 77 L.Ed. 1494 (1933), where we stated the Pennsylvania rule as follows:
 
 
 26
 But the statute does not begin to run where the facts are suppressed and deliberately concealed from the plaintiff. Such conduct tolls the statute, and in that case it does not begin to run until the plaintiff has knowledge of the facts constituting the cause of action or by reasonable diligence should have had such knowledge.
 
 
 27
 Id. at 925 (emphasis added).
 
 
 28
 The Pennsylvania cases following Swietlowich reinforce our interpretation of Pennsylvania law set forth in that case. In Rothman v. Fillette, 503 Pa. 259, 266 n. 3, 469 A.2d 543, 546 n. 3 (1983), the Court stated: "the law is clear that fraud or deceit tolls the statute of limitations until such time as the fraud has been discovered by the exercise of due diligence." Even more pertinent is the recent opinion of the Pennsylvania Commonwealth Court in Dudley v. Workmen's Compensation Appeal Board, 80 Pa.Cmwlth. 233, 471 A.2d 169 (1984). There, the court stated that, "[t]he 'discovery rule,' applicable to medical malpractice actions, is a closely related application of estoppel principles where fraud or deception, intentional or otherwise, may cause a potential plaintiff to fail to file a claim within the statutory period." Id. at 239, 471 A.2d at 172. After stating that under the discovery rule, " 'the statute of limitations does not begin to run until such time as the injury's existence is known or discovered, or becomes knowable or discoverable by the exercise of reasonable diligence,' " id. at 240, 471 A.2d at 172 (citation omitted), the court proceeded to apply the same standard to the fraudulent concealment cases: "When an employer, through its acts or statements, lulls a claimant into a false sense of security regarding the filing of a workmen's compensation claim, those actions, whether intentional or unintentional, toll the running of the limitations period of section 315 of the Act. That period reasonably should not begin until the claimant knows, or with reasonable diligence could know, of his deception." Id. at 241, 471 A.2d at 173 (footnote omitted).
 
 
 29
 We therefore reject the Urlands' contention that Pennsylvania would not apply the reasonable diligence test in fraudulent concealment cases.
 
 B.
 
 30
 The Urlands also argue that the district court improperly refused to allow them to introduce evidence purporting to show fraudulent concealment by Merrell-Dow of test results showing that Bendectin causes birth defects. The district court refused to admit such testimony because it assumed concealment for purposes of the inquiry on the statute of limitations and therefore instructed the jury that they should assume that the O'Dillon letter was false and misleading. Thus, the court explained:
 
 
 31
 The only thing, as far as her state of mind is concerned, the only thing that is relevant is the information that she received from her inquiries. One of which is the O'Dillon response.
 
 
 32
 App. at 207. The Urlands argue that evidence of the purported fraud was necessary to show the "nature, quality and extent of the fraud and how it touched the Urlands not only through the O'Dillon letter but through their other contacts with the medical community." Appellant's Brief at 19.[3]
 
 
 33
 However, because the district court had instructed the jury to assume that the O'Dillon letter was false and misleading, it did not abuse its discretion in rejecting any further evidence on the concealment issue. It could have reasonably decided not to embark on the complex issue of whether, in fact, Merrell-Dow had concealed relevant and damaging test results in the context of the threshold decision of the statute of limitations. See Fed.R.Evid. 403.
 
 V.
 Discovery
 
 34
 The Urlands argue that the district court erred in charging the jury that they must determine whether the Urlands knew or should have known "that Bendectin was an operative cause of the birth defect." App. at 356. The Urlands argue that knowledge that Bendectin caused their daughter's birth defect is not itself sufficient to start the statute running, but rather that they were required to know of a causal connection between the birth defect and Merrell-Dow's conduct.
 
 
 35
 In Pennsylvania, the relevant inquiry for purposes of the statute of limitations is whether plaintiffs knew or reasonably should have known of the causal relationship between the injury and conduct causing that injury. Cathcart v. Keene Industrial Insulation, 324 Pa.Super. at 136-37, 471 A.2d at 500. However, plaintiffs need not know that they have a cause of action or that the injury was caused by another party's wrongful conduct. See Chandler v. Johns-Manville Corp., 352 Pa.Super. 326, 330-31, 507 A.2d 1253, 1255-56 (1986); Price v. Johns-Manville Corp., 336 Pa.Super. 133, 137-39, 485 A.2d 466, 468-69 (1984); DeMartino v. Albert Einstein Medical Center, Northern Division, 313 Pa.Super. 492, 499-503, 460 A.2d 295, 298-300 (1983). "[O]nce [a plaintiff] possesses the salient facts concerning the occurrence of his injury and who or what caused it, he has the ability to investigate and pursue his claim." Berardi v. Johns-Manville Corp., 334 Pa.Super. 36, 44, 482 A.2d 1067, 1071 (1984) (emphasis in original) (quoting Staiano v. Johns Manville Corp., 304 Pa.Super. 280, 288, 450 A.2d 681, 685 (1982)). In this case plaintiffs were clearly aware of Merrell-Dow's identity and its connection with the drug, and thus the court's charge was not error.
 
 
 36
 The Urlands object to an example given to the jury by the district court to illustrate the notion of operative cause. In a supplemental instruction, the court stated:
 
 
 37
 Let me give you another example. Suppose at lunch you ate a lot of watermelon and fruit and your stomach is not feeling so good. You might say the fruit caused my upset stomach. That's the kind of thing we're talking about now. None of you are physicians, so you can't really give a medical opinion on causation, but you have, you know your body and you know what upsets your stomach and you can tell. That's the type of causation we are talking about.
 
 
 38
 App. at 379. The court explained to the jury that the causation to be considered in applying the discovery test is "[n]othing technical, nothing legal, nothing medical, but ordinary causation that we speak about every day. Cause and effect that we speak about every day." App. at 379.
 
 
 39
 The Urlands argue that the watermelon example does not focus upon the relationship between the injury and Merrell-Dow's conduct. However, the Urlands did not object to the instruction on this ground before the district court. In any event, looking at the instructions as a whole, we find no error.
 
 VI.
 Minor's Tolling Statute
 
 40
 Finally, the Urlands argue that even if they are barred by operation of the Pennsylvania discovery rule, the claim of their daughter Julie was revived by 42 Pa.Cons.Stat.Ann. Sec. 5533(b), which provides that the statute of limitations cannot run against a child during the period of minority.[4] We reject Merrell-Dow's contention that the Urlands did not preserve this contention, and therefore turn to its merits.
 
 
 41
 Under prior Pennsylvania law, minors were subject to the adult statute of limitations. See, e.g., Walters v. Ditzler, 424 Pa. 445, 450, 227 A.2d 833, 835 (1967). The minor's tolling statute was enacted on May 30, 1984, effective 30 days thereafter. Under Pennsylvania law, "after an action has become barred by an existing statute of limitations, no subsequent legislation will remove the bar or revive the action." Overmiller v. D.E. Horn & Co., 191 Pa.Super. 562, 568, 159 A.2d 245, 248 (1960); see Clark v. Jeter, 358 Pa.Super. 550, 555, 518 A.2d 276, 278 (1986); Petition of Weigand, 214 Pa.Super. 371, 374-75, 257 A.2d 627, 629 (1969).
 
 
 42
 Thus, it has consistently been held that the minor's tolling statute does not act to revive claims that had already been barred by the applicable statute of limitations prior to the effective date of the Act. See Redenz v. Rosenberg, 360 Pa.Super. 430, 434-35, 520 A.2d 883, 885 (1987); Lewis v. City of Philadelphia, 360 Pa.Super. 412, 416, 520 A.2d 874, 876 (1987); Maycock v. Gravely Corp., 352 Pa.Super. 421, 425-28, 508 A.2d 330, 333-34 (1986); see also Robinson v. Kelly, No. 86-4484, slip op. at 2 (E.D.Pa. Mar. 31, 1987); Orozco v. Children's Hospital of Philadelphia, 638 F.Supp. 280, 283-84 (E.D.Pa.1986). Because the jury found that the Urlands' claim had been barred by the time they brought their action on October 7, 1981, Julie's claim could not be revived by the subsequent enactment of the minor's tolling statute.
 
 
 43
 The Urlands argue, relying on 1 Pa.Cons.Stat.Ann. Sec. 1928(c),[5] that we should construe the minor's tolling statute liberally to effectuate its remedial and humanitarian purposes. However, the Pennsylvania courts found nothing in the legislative history of the minor's tolling statute indicating that the General Assembly intended the Act to apply to previously barred claims, and we are bound to follow their interpretation of their own statutes.[6]
 
 VII.
 Conclusion
 
 44
 We find no reversible error. We stress that in this case, the district court did not decide in favor of Merrell-Dow's statute of limitations defense on a pre-trial motion. Instead, the issue was fairly presented to a jury, which decided the relevant factual question adversely to the Urlands. The Urlands do not argue on appeal that there was insufficient evidence to support the jury's verdict.
 
 
 45
 For the reasons stated, the order of the district court entering judgment in favor of Merrell-Dow will be affirmed.
 
 
 46
 BECKER, Circuit Judge, dissenting.
 
 
 47
 The majority endorses the district court's special interrogatory, the function of which was to encapsulate the applicable law:
 
 
 48
 "Have Mr. and Mrs. Urland proved by a preponderance of the evidence that neither of them knew, or exercising reasonable diligence should have known, before October 7, 1979 [i.e., two years before their suit was filed], that Bendectin was an operative cause of Julie Beth Urland's birth defect as alleged in their complaint?"
 
 
 49
 This formulation effectively equates the discovery rule and the doctrine of fraudulent estoppel. It also constitutes a rejection of the actual knowledge standard that I believe Pennsylvania would apply to these facts, which implicate fraudulent estoppel. I therefore believe that the majority's approval of the interrogatory was erroneous.[1] Because I also believe that it was not harmless error to fail to apply the applicable actual knowledge standard or to otherwise account for the plaintiffs' higher burden of discovering the operative cause of Julie Beth Urland's birth defects after defendant's presumptively fraudulent concealment, I respectfully dissent.
 
 I.
 
 50
 Pennsylvania has long recognized that the purposes of the estoppel doctrine differ markedly from those for the discovery rule. See, e.g., Smith v. Blachley, 198 Pa. 173, 47 A. 985, 987 (1901); see also Schaffer v. Larzelere, 410 Pa. 402, 405-06, 189 A.2d 267 (1963) (drawing distinction between fraudulent estoppel and discovery rule); Barshady v. Schlosser, 226 Pa.Super. 260, 313 A.2d 296, 298-99 (1974) (same); cf. Tomera v. Galt, 511 F.2d 504, 510 (7th Cir.1975) (quoting Smith v. Blachley to draw distinction). We have recently had occasion to note the continuing vitality of this distinction between the discovery rule and the doctrine of fraudulent estoppel, finding that, in addition to the discovery rule, "[t]he doctrine of estoppel is recognized under Pennsylvania law as a wholly distinct theory for tolling the statute of limitations." Ciccarelli v. Carey Canadian Mines, Ltd., 757 F.2d 548, 556-57 (3d Cir.1985).
 
 
 51
 The critical area of concern is, of course, the level of knowledge that the Urlands must have obtained before the statute of limitations began to run against them despite the defendant's alleged fraudulent concealment. We must therefore examine the "actual knowledge" standard advocated by the Urlands[2] and articulated by the Pennsylvania Supreme Court in several leading cases. See, e.g., Nesbitt v. Erie Coach Company, 416 Pa. 89, 96, 204 A.2d 473, 477 (1964) ("the statute remains quiescent until actual knowledge arises"); Schwab v. Cornell, 306 Pa. 536, 540, 160 A. 449, 450 (1932) (same). The majority attempts to distinguish these cases on the basis that, in all of them, "there appears to have been no basis in the facts to discuss the reasonable diligence standard." While these cases are not pellucid, with all respect, I believe that the majority's basis for distinction is too narrow and fails to hold up under analysis.[3]
 
 
 52
 In Nesbitt, the plaintiff was seriously injured on defendant's bus, but the blandishments of defendant's claims adjusters lulled her into a false sense of security and she let the statute of limitations pass before bringing suit. The trial court granted summary judgment for the defendant, but the Supreme Court of Pennsylvania refused to let that holding stand. It concluded that the facts as developed at that stage would constitute fraudulent concealment on the part of the defendant, and it therefore vacated the trial court's order to the contrary. The court stated
 
 
 53
 "If the circumstances are such that a man's eyes should have been open to what is occurring, then the statute begins to run from the time when he could have seen, but if by concealment, through fraud or otherwise, a screen has been erected by his adversary which effectually obscures the view of what has happened, the statute remains quiescent until actual knowledge arises."
 
 
 54
 204 A.2d at 477 (quoting Schwab, 306 Pa. at 539, 160 A. 449; emphasis supplied). The court adopted this language despite objections to it by the dissent. Id., 204 A.2d at 477 (Bell, C.J., dissenting). Furthermore, because the court remanded the case "with directions to the court below to make complete findings of fact," this language represented instructions to the trial court to determine whether plaintiffs achieved "actual knowledge" at a time before the statutory limitation period. In my view, the court's instructions, in the face of a dissent, reflects a reasoned choice for the higher standard of actual knowledge.[4]
 
 
 55
 The majority's handling of Schwab is similarly flawed. That leading case specifically eschewed any "should have known" standard in favor of the actual knowledge standard it adopted.
 
 
 56
 In Schwab, the purchaser of certain property employed a conveyancer to prepare the deed, to see that title was clear of encumbrances and to obtain comprehensive title insurance that was to guarantee good title. Although title to the home was subject to liability for unpaid taxes, the conveyancer wrote a letter assuring the purchaser that the title was clear of liens, also enclosing a title policy said to show that "the title [is] entirely clear of liens with the exception of certain rights guaranteed the telephone company and" the electric company. 306 Pa. at 538, 160 A. 449 (quoting letter). The title policy that the conveyancer had actually procured, however, did not insure against unpaid taxes. After the home had been sold some five and a half years later for collection of unpaid taxes, the purchaser discovered the conveyancer's negligence and brought an action. In response, the conveyancer pled the statute of limitations.
 
 
 57
 Reversing the trial court's directed verdict for the conveyancer, the Supreme Court of Pennsylvania found that the tax sale of the house was the point of actual knowledge from which the statute should run. The court specifically held unavailing the contention that the plaintiff should have known from the title policy itself that the tax lien was not covered:
 
 
 58
 The fact that plaintiff had the title policy in his possession, which showed taxes excepted as a lien against which the title was not insured, does not alter the situation created by defendant's letter which transmitted it to him; the letter would effectually close plaintiff's eyes to the particular terms of the policy.
 
 
 59
 306 Pa. at 540-41, 160 A. 449. Once again, a reasonable diligence standard would have fit the facts; once again, the Pennsylvania Supreme Court chose to hold it inapplicable. Instead, the court specifically found that actual knowledge was the proper standard. Id. at 539-40, 160 A. 449 (quoted supra at 1271).
 
 
 60
 I also believe that the majority gives too much credence to those cases in which it finds support for its decision.[5] For example, Smith v. Blachley, 198 Pa. 173, 47 A. 985 (1901), one of the two principal cases on which the majority relies, does not even concern fraudulent concealment. Smith was an action to recover money obtained by gross fraud and deception, and "there was no evidence that after the transaction was complete defendant did anything or said anything to prevent investigation." See 198 Pa. at 174, 179, 47 A. 985 (quoting lower court); id. at 180, 47 A. 985 (Supreme Court's finding of fact); see also Smith v. Blachley, 188 Pa. 550, 552-53, 41 A. 619 (1898) (relating full facts). Rather than dealing with post-injury fraud that conceals the operative cause of the harm, the case concerns discovery of the underlying tort. Reliance on Smith in the fraudulent concealment context is misplaced. Only the discovery rule was implicated, not the rule for cases of fraudulent estoppel.[6]
 
 
 61
 The majority also relies on Deemer v. Weaver, 324 Pa. 85, 187 A. 215 (1936). See Maj.Op. at 1274. In Deemer, the remaindermen of a life estate in certain real property sued the estate of the owner of life interest for a violation of a fiduciary duty alleged to have occurred when, under agreement of all parties, the property was sold for $5,000. The money was then placed in a trust with the income paid to the owner of the life interest; the principal was to be paid to the remaindermen upon the life tenant's decease. When the life tenant died, the remaindermen discovered that the buyer of the property paid not only the $5,000 stated in the deed of conveyance, but an additional $4,000 as a "bonus" to the life tenant.
 
 
 62
 Because the suit was commenced almost fifteen years after the transaction upon which the remaindermen based their complaint, the trial court found the suit barred by the statute of limitations. The Supreme Court reversed, finding that "the decedent concealed from plaintiffs all facts which might have put them on notice that her statements ... were false." 324 Pa. at 89, 187 A. 215. Although the court discussed the duty of reasonable diligence, as the majority notes, it did so chiefly to point out that defendant's fraud relieved the plaintiffs of their obligation to investigate: because "the concealment practiced by [defendant] ... completely hid the situation from plaintiffs," 324 Pa. at 89, 187 A. 215, plaintiffs had "no reason to make investigation, [and] they are not chargeable with what such investigation would have disclosed." Id. The case therefore deals chiefly with the depth of fraud necessary to toll the statute of limitations. To the extent that it addresses the circumstances after the fraudulent concealment that will trigger the statute, the Deemer court found "the principle applicable in cases of this kind" to be the rule of Nesbitt and Schwab, quoted supra at 1278, which sets forth the actual knowledge standard in fraudulent concealment cases. See 324 Pa. at 88-89. It therefore seems to me that rather than supporting the majority, Deemer lends support for the "actual knowledge" standard.
 
 
 63
 In sum, in cases of fraudulent concealment, it is the defendant's lulling that negates any reason for the plaintiff to inquire further. I believe that the Pennsylvania jurisprudence means what it says: that there is a higher standard to overcome when fraudulent concealment has been shown. At the very least, the Pennsylvania cases do not and cannot mean what the majority says: that the discovery rule states the applicable test when fraudulent concealment has been shown.
 
 II.
 
 64
 I also believe that the majority is wrong on policy grounds. The doctrine of fraudulent estoppel rests on a rationale that is wholly distinct from that for the discovery rule. See Ciccarelli, 757 F.2d at 556-57. It concerns not the diligence of the plaintiff[7] but the misdeeds of the defendant; it therefore addresses the situation where a cause of action goes undiscovered because the defendant has taken positive steps to conceal it. See Schaffer v. Larzelere, 410 Pa. 402, 405, 189 A.2d 267 (1963) (estopping invocation of statute of limitations where, "through fraud or concealment, the defendant causes the plaintiff to deviate from his right of inquiry"); Plazak v. Allegheny Steel Co., 324 Pa. 422, 431, 188 A. 130 (1936); McNair v. Weikers, 300 Pa.Super. 379, 388, 446 A.2d 905 (1982); see also Ciccarelli, 757 F.2d at 557.[8] As Professor Dawson noted long ago, by the doctrine of fraudulent estoppel, courts are "led beyond a scrutiny of the original cause of action and of the plaintiff's later opportunities for discovery, to an emphasis on the means by which the defendant obstructed discovery." Dawson, "Fraudulent Concealment and Statutes of Limitation," 31 Mich.L.Rev. 875, 880 (1933) (emphasis in original).[9]
 
 
 65
 In a discovery rule case without fraudulent concealment, the plaintiff has the burden of using due diligence to discover the operative cause of his injury. When a defendant fraudulently conceals its misconduct, however, the injured person has a double burden: not only is there a burden of discovering the basis for the claim, he or she must also discover the defendant's fraud. A "should have known standard" is therefore inappropriate because it is also necessary to account for plaintiffs' extra burden of acquiring knowledge of the fraud, without which they could not discover, or realize that prior to the fraud they had discovered, the basis for the claim. The way in which Pennsylvania appears to have accounted for this extra burden is by insisting on a higher threshold of knowledge on the part of the plaintiff before the claim will be barred--the "actual knowledge" standard identified and then repudiated by the majority. The district court failed to recognize this higher burden, and the majority not only does likewise, but also attempts to explain it away by a crabbed reading of the relevant Pennsylvania cases.
 
 
 66
 I also believe that, by adopting the same test for fraudulent estoppel as for original discovery, the majority unwittingly adopts a standard that may arguably encourage fraudulent concealment by defendants. Because, through the discovery rule, the statute of limitations does not begin to run until the plaintiff should have known of defendant's liability, application of the "should have known" standard in fraudulent concealment cases creates no greater burden; defendants face no penalty if they attempt to conceal their wrongdoing but are later discovered. In contrast, the actual knowledge standard "serves as a punitive measure and perhaps as a deterrent of future fraud." Hohri v. United States, 782 F.2d 227, 248 (D.C.Cir.1986), vacated for want of jurisdiction, --- U.S. ----, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987).
 
 
 67
 This policy analysis refines the issues surrounding the requisite level of knowledge beyond that engaged in by the Pennsylvania cases. A higher knowledge standard than "should have known" is necessary both to account for plaintiff's extra burden of overcoming defendant's fraud and to discourage fraud. While the Pennsylvania Supreme Court may not have explicitly adopted this particular policy analysis, at the very least its jurisprudence requires much more than notice inquiry and looks to a level that approximates actual knowledge. In my view, the correct test, as enunciated by the Pennsylvania cases, is that the statute runs only when a plaintiff actually knows that she has a reasonable basis for a claim against the defendant.
 
 III.
 A.
 
 68
 Even assuming that the tolling from fraudulent estoppel ends when the plaintiff should have known of the operative cause of her injury, I believe that the inquiry should focus entirely on the post-fraud period. In other words, the existence of effective fraud by the defendant should toll the statute, and the plaintiff should have two years to file suit after learning of the operative cause of the injury. In this case, the district court's instructions did not differentiate between the pre-fraud and post-fraud periods, and I believe that this failure constitutes an additional grounds for reversal.
 
 
 69
 The facts of this case demonstrate that a jury could find that the Urlands knew or through reasonable diligence should have known of the operative cause of Julie's birth defects at three different times: (1) in 1972 before Merrell-Dow is alleged to have engaged in the fraud that erected the concealing screen; (2) in September 1979, when a reporter from the National Enquirer called the Urlands, told them their letter to the FDA had come to light in a trial in Miami, and had Mrs. Urland pose for a picture with Julie, and (3) later in 1979, on whatever date Mr. Urland purchased the October 9, 1979 issue of the National Enquirer[10] with the news story alleging that Merrell-Dow had concealed scientific information suggesting that Bendectin was a teratogen. Because the fraudulent concealment at least excused the failure to file suit until subsequent events revealed the danger of Bendectin, only the latter two dates are relevant to this case.
 
 
 70
 The district court, however, failed to distinguish these different periods in its charge to the jury or in its special interrogatory, both of which referred generally to the Urlands' knowledge before October 7, 1979. Furthermore, the district court allowed the defendant's counsel to argue to the jury that the Urland's should have known of the operative cause before the concealing screen erected. See App. at 283. Taking this opportunity, counsel marshalled the facts concerning Mrs. Urland's letters to Senator Scott, the March of Dimes, the FDA, and Merrell-Dow and argued:
 
 
 71
 she featured [Bendectin], it stood out, it was targeted, it was singled out, she acknowledges that she conducted an investigation, she acknowledges that she made an inquiry and she acknowledges that she harbored suspicion.
 
 
 72
 App. at 324. He concluded that the Urlands "had reason to know back in 1972" and that "a reasonable person would have known that was the operative cause." Id. By failing to direct the jury's attention to the post-fraud period, the trial court committed reversible error, even if the reasonable diligence standard were appropriate.
 
 B.
 
 73
 By equating the doctrine of fraudulent concealment with the discovery rule without specifically focusing the jury's attention on the post-fraud period, the trial court rendered Merrell-Dow's fraud just one factual determinant of what the Urlands should have known and when they should have known it. The factual impact of fraud on the Urlands ability to know, however, depends on the extent of that fraud. I therefore believe that the trial court was in error when it excluded the facts relevant to the fraud, for in so doing, the court kept from the jury vital information concerning the impact of the fraud on what the Urlands should have known.
 
 
 74
 Although it remains to be proven at trial, the plaintiffs alleged by proffer that Merrell-Dow erected a concealing screen by deceiving the medical community in general and the Urlands in particular about the teratogenic properties of Bendectin. Plaintiffs offered to prove that Merrell-Dow had tested animals and found that Bendectin tended to cause birth defects, but that the company failed to disclose the results of the research to either the Food and Drug Administration (FDA) as required by law or to the Urlands in response to their letter to Merrell-Dow. Plaintiffs contend that because the FDA was unaware of the teratogenicity of Bendectin, the medical community, for which FDA was the surrogate, was unaware of the risks involved with the drug; therefore, the agency could not inform the Urlands directly in response to their inquiry. Additionally, Merrell directly responded to the Urlands' letter of inquiry by informing them that "the drug was not an agent that has the potential for causing malformations." App. at 293-94 (letter by Merrell). It was only this letter from Merrell to the Urlands that the trial court allowed in as evidence, instructing the jury to assume that it was "misleading."
 
 
 75
 Merrell's alleged misrepresentations to the FDA, however, also may have prevented the Urlands from discovering the dangers of Bendectin. The district judge excluded evidence of these misrepresentations.
 
 
 76
 While I disagree with the majority that the reasonable diligence standard is proper, if that standard is to be applied, the jury should have before it the full information concerning what the plaintiffs could discover with reasonable diligence. By excluding this information from the jury, the trial judge deprived the jury of highly probative information concerning the effect of Merrell's actions on what the Urlands should have reasonably discovered. I therefore believe that the district court's exclusion of evidence concerning the alleged fraud was prejudicial and constitutes an independent basis for reversal.
 
 IV.
 
 77
 It may well be that the Urlands are time-barred from bringing their claim because of the information they acquired from the National Enquirer reporter. But it is up to a jury, properly charged as to the applicable law, to determine if that information was strong enough to overcome the concealing screen and give the plaintiffs the knowledge that they have a reasonable basis for a claim. Because the trial court's charge allows a variety of mistaken results, I would reverse and remand for a new trial.
 
 
 
 *
 Hon. Clarkson S. Fisher, Chief Judge, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 The district court instructed the jury that
 I am asking you to assume in this first phase of the case that the Dr. O'Dillon letter is inaccurate and misleading.
 * * *
 The reason it's important for you to assume that the O'Dillon letter is inaccurate and misleading is that that bears to some extent, it seems to me, and I so instruct you, on the state of mind of Mr. and Mrs. Urland in 1979, which is the crucial issue before the case at this point, in September and October of 1979.
 App. at 351-352.
 
 
 [2]
 Plaintiffs did not clearly and unambiguously object to the interrogatory given to the jury on the ground that it erroneously included the "should have known" language, did not proffer either an instruction or interrogatory to the effect that the statute begins to run only after "actual knowledge", and did not object to the charge given on this ground. In fact, during the pre-charge conference when plaintiffs' counsel, Mr. Eaton, argued for a separate interrogatory on fraud, he included a "reasonably should know" standard:
 See, my problem is, I believe the legal test is, and we can offer authorities on it if you give me a little time to look at it, is that the statute is tolled to such time as the plaintiffs know or reasonably should know that the effects of the fraud are no longer operative on them. And I believe that that should be a separate question from the straight discovery, other than the straight discovery issue which we're submitting to the jury now.
 App. at 276 (emphasis added). Nor did he "correct" the court when in the same colloquy it summarized plaintiffs' position as including both the "know" and "reasonably should know" standard to be used in overcoming the fraud for purposes of statute of limitations. See App. at 280, 282.
 
 
 [3]
 The Urlands also argue that the district court erred in instructing the jury that Merrell-Dow denied that the O'Dillon letter was inaccurate and misleading and that Merrell-Dow reserved the right to have that issue tried later in the case. However, the record is clear that the Urlands agreed to this charge. See App. at 207
 
 
 [4]
 The statute provides:
 If an individual entitled to bring a civil action is an unemancipated minor at the time the cause of action accrues, the period of minority shall not be deemed a portion of the time period within which the action must be commenced. Such person shall have the same time for commencing an action after attaining majority as is allowed to others by the provisions of this subchapter. As used in this subsection, the term "minor" shall mean any individual who has not yet attained the age of 18.
 
 
 [5]
 The statute provides:
 All other provisions of a statute shall be liberally construed to effect their objects and to promote justice.
 
 
 [6]
 The Urlands also argue that failure to apply the minor's tolling statute to revive Julie's claim would constitute a violation of equal protection. The Urlands did not raise the equal protection issue before the district court, and therefore this issue cannot be raised on appeal
 
 
 [1]
 In addition, the charge to the jury speaks of "the state of mind of Mr. and Mrs. Urland in 1979," two years before they filed suit, but similarly fails to distinguish between that which was known before and after the presumptive fraud. By finding that the misleading letter bears only "to some extent" on the Urlands' state of mind, the trial judge improperly minimized the concealing effect of the fraud--an especially harmful mistake, because no evidence concerning the scope and extent of the fraud was allowed to be presented to the jury. Moreover by encapsulating the reasonable diligence inquiry, it suffers from the same basic infirmity as the interrogatory: it failed to adopt the actual knowledge standard
 
 
 [2]
 The majority argues that "it is questionable whether the Urlands preserved this argument in the district court." Maj.Op., at 1272. Because its opinion goes on to address the issue, the majority must have resolved its doubts in favor of preservation. Moreover, this resolution best comports with the record. As counsel for the plaintiff clearly stated at one point:
 We're submitting this case to the jury only on the issue of when ... was the operative cause discovered or discoverable with exercise of reasonable diligence. We do not believe that would be sufficient to resolve the estoppel claim, and we understand the Court's prior ruling, but you understand I'm trying to preserve it, your Honor.
 App. at 273.
 
 
 [3]
 As has been said long ago, "[i]t would be a laborious and unprofitable task to examine all the cases which have been decided on the statute of limitations." Fries v. Boisselet, 9 Serg. & R. 128, 130 (1822). I similarly do not believe it useful to offer extensive interpretation of all but the most important Supreme Court of Pennsylvania cases relied on by the majority. The other cases I find unpersuasive or inapplicable. For example, although the court in Schaffer v. Larzelere, 410 Pa. 402, 189 A.2d 267 (1963), spoke in terms of reasonable diligence, it specifically applied the actual knowledge standard and found that "the limitations period would not begin to run herein until December 29, 1959," id. 189 A.2d at 270, "because the negligence of the defendant did not come to [plaintiff's] knowledge until December 29, 1959." Id. 189 A.2d at 269, (emphasis in original). Similarly, this Court's decision in Swietlowich v. County of Bucks, 610 F.2d 1157 (1979) is susceptible to the same failings that the majority finds in other cases, for it was "decided without reference to the distinction now under consideration." Maj.Op., at 1273. By contrast, moreover, this Court specifically decided in Ciccarelli v. Carey Canadian Mines, Ltd., 757 F.2d 548, 556-57 (3d Cir.1985), that in addition to the discovery rule, "[t]he doctrine of estoppel is recognized under Pennsylvania law as a wholly distinct theory for tolling the statute of limitations."
 
 
 [4]
 Although the majority finds Nesbitt feeble in this context, it relies on the case as good law in order to limit this Court's pronouncement that, "if through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry, the defendant is estopped from invoking the bar of limitation of action." Ciccarelli v. Carey Canadian Mines, Ltd., 757 F.2d 548, 556 (3d Cir.1985); see Maj.Op., at 1272-1273. The majority advances no reason why Nesbitt's adoption of the actual knowledge standard for renewing the statute of limitations is strong enough to have "resolved the issue [of permanent estoppel] adversely to the Urlands," Maj.Op. at 1273 yet is too weak to suggest that the actual knowledge standard is not applicable when the plaintiff relies on fraudulent concealment for tolling
 
 
 [5]
 None of these cases, it should be noted, were decided after Nesbitt, in which the Supreme Court of Pennsylvania embraced the actual knowledge standard for application upon remand. As the latest pronouncement of the highest court, Nesbitt deserves special weight that cannot be accorded these earlier cases
 
 
 [6]
 The Pennsylvania Supreme Court in Smith explicitly recognized that "a distinction is made in regard to the starting point of the statute [of limitations] between fraud completed and ending with the act which gives rise to the cause of action, and fraud continued afterwards in efforts or acts tending to prevent discovery." 198 Pa. at 175, 47 A. 985; see also id. at 179, 47 A. 985 ("We regard the distinction as sound, well marked and in harmony with the spirit and letter of the statute.")
 
 
 [7]
 The discovery rule concerns the diligence of the plaintiff, as it is "based upon the recognition that if a party, despite the exercise of reasonable diligence, cannot ascertain his injury, the statute of limitations should not run against his claim." Anthony v. Koppers Co., Inc., 284 Pa.Super. 81, 89, 425 A.2d 428, 432, rev'd on other grounds, 496 Pa. 119, 436 A.2d 181 (1981)
 
 
 [8]
 Thus, under both the doctrine of fraudulent estoppel and the discovery rule, "the statute is tolled only for those who remain ignorant through no fault of their own." Morgan v. Koch, 419 F.2d 993, 997 (7th Cir.1969)
 
 
 [9]
 The discovery rule, in contrast, asks "not what did the plaintiff know of the injury done him, but what might he have known by the use of the means of information within his reach with the vigilance the law requires of him?" Med-Mar, Inc. v. Dilworth, 214 Pa.Super. 402, 407, 257 A.2d 910, 913 (1969) (citations omitted)
 
 
 [10]
 This assumes, of course, that the jury would find that Mr. Urland purchased and read the newspaper more than two years before plaintiffs filed suit