**Denise BOHUS, Appellant,**

v.

**Stanley A. BELOFF.**

**No. 91–1183.**

United States Court of Appeals,
Third Circuit.

Argued July 30, 1991.

Decided Dec. 13, 1991.

---

Yale F. Edeiken (argued), Walker, Miller & Cavacini, Allentown, Pa., for appellant.

Michael O'Hayer (argued), Hugh M. Emory, Duane, Morris & Heckscher, Wayne, Pa., for appellee.

Before BECKER, SCIRICA and ROTH, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this medical malpractice action, plaintiff appeals the district court's order granting defendant's motion for judgment n.o.v. and new trial. The central issue on appeal is the proper application of the statute of limitations. We will reverse.

### I.

In July, 1982, plaintiff Denise Bohus was employed as a "bunny" in the Playboy Club in Atlantic City, New Jersey. This job required her to wear shoes with four- to five-inch heels and remain on her feet for five to seven hours each work shift. In October, 1983, Bohus met defendant Stanley Beloff, D.P.M., a podiatrist, and informed him that she was experiencing foot pain at the end of her work shifts. At Dr. Beloff's suggestion, she made an appointment for an office visit on November 8, 1983.

Dr. Beloff diagnosed her condition as bilateral hallux abductus valgus, bunion deformity, and bilateral Morton's syndrome (bunions), and advised her that surgery was necessary to correct the disorder. According to Bohus, Dr. Beloff assured her that within a "couple of months" after surgery she would be able to return to work in high-heeled shoes. On January 3 and 24, 1984, Dr. Beloff performed a modified McBride bunionectomy on Bohus's feet.

After surgery, Bohus visited Dr. Beloff several times for follow-up treatment. She returned to work on April 4, 1984, but complained that she was still experiencing foot pain. Dr. Beloff assured her that the pain would eventually subside. Bohus next saw Dr. Beloff in July, 1984, when she again complained of foot pain. Dr. Beloff told her that her feet "would take six months to a year to heal," and that her feet would feel "much better" if she got her shoes re-soled. When Bohus later informed Dr. Beloff that her feet still caused her discomfort, he told her that it "couldn't be" and refused to give her further medical releases from work.

Shortly after her July, 1984, visit to Dr. Beloff, Bohus began consulting other physicians. Bohus first visited David Zuckerman, D.P.M., a podiatrist, on August 2, 1984.[1] Bohus asked Dr. Zuckerman to examine Dr. Beloff's pre- and post-operative foot x-rays. She informed Dr. Zuckerman that, although her surgery had been performed seven months earlier, the condition of her feet had "troubled her" for five months. After examining Bohus and the x-rays of her feet, Dr. Zuckerman told her that the surgery performed by Dr. Beloff

---

[1] Although Bohus testified that the first doctor (after Dr. Beloff) she visited was Edward Theiler, III, M.D., an orthopedic surgeon, it was later established that the next doctor she saw was Dr. Zuckerman. Claiming an "innocent failure of recollection," Bohus did not mention her consultation with Dr. Zuckerman in either her response to Dr. Beloff's interrogatories or her deposition. This fact came to light when Dr. Zuckerman read a newspaper article about the outcome of the trial, and contacted Dr. Beloff in April, 1989, after post-trial motions had been filed.

was "reasonable," and gave her a two-month medical excuse from work.

Still experiencing pain, Bohus next consulted Edward Theiler, III, M.D., on August 31, 1984, seeking another work excuse. According to Bohus, although she brought Dr. Beloff's x-rays with her, she never described to Dr. Theiler the details of the surgery or post-operative treatment performed by Dr. Beloff. Dr. Theiler said that he did not remember Bohus mentioning Dr. Beloff during the visit. Dr. Theiler diagnosed Bohus's pain as the result of normal healing after surgery, and told her it would subside with time and exercise.[2] Dr. Theiler gave Bohus a four-month medical excuse.

Rather than subsiding, Bohus's pain worsened to the point where she was unable to wear any type of footwear and experienced constant discomfort, even when not placing weight on her feet. Bohus then contacted Mark Cerciello, M.D., an orthopedic surgeon, in November, 1984. At the same time, Bohus called Dr. Beloff's office to request that her medical records be forwarded to Dr. Cerciello. These records were sent on December 26, 1984, but were not received by Dr. Cerciello until after Bohus's first visit.

Dr. Cerciello first examined Bohus on January 9, 1985. During that visit, or the following visit two weeks later, Dr. Cerciello suggested that Dr. Beloff had done something wrong and asked Bohus whether she had a lawyer. Dr. Cerciello told Bohus that she had a metatarus primus varus deformity, which caused her bunions to recur. He performed surgery on Bohus's feet on February 21, 1986, and December 12, 1986, to correct the deformity.

On December 31, 1986, more than two years after Dr. Beloff's surgery and post-operative treatment but less than two years after she was first examined by Dr. Cerciello, Bohus filed a medical malpractice

action against Dr. Beloff. At trial Bohus contended that she did not discover she was injured as a result of Dr. Beloff's surgery until her first or second visit to Dr. Cerciello in January, 1985, and, therefore, her action was timely filed. Both at the close of Bohus's case and the close of all the evidence, Dr. Beloff moved for a directed verdict contending that Bohus's action was barred by the two-year statute of limitations. The district court denied both motions, and the jury returned a verdict for Bohus in the amount of $125,000.[3]

Dr. Beloff filed post-trial motions for judgment n.o.v. (Fed.R.Civ.P. 50(b)); and new trial (Fed.R.Civ.P. 60(b)), based on newly discovered evidence. The district court granted Dr. Beloff's motion for judgment n.o.v. on the ground that the statute-of-limitations issue should not have been submitted to the jury. *Bohus v. Beloff*, No. 86–7591, slip op. at 11, 1991 WL 21654 (E.D.Pa. Feb. 13, 1991). The court also granted in the alternative, under Fed. R.Civ.P. 50(c), Dr. Beloff's motion for new trial on the ground that newly discovered evidence of Bohus's visit to Dr. Zuckerman could have altered the jury's verdict. *Id.* at 10, 21. This appeal followed.

## II.

■ We have jurisdiction under 28 U.S.C. § 1291. In reviewing the district court's order granting judgment n.o.v., we apply the same standard as the district court. *General Elec. Credit Corp. v. Ger–Beck Mach. Co.*, 806 F.2d 1207, 1209 (3d Cir.1986). We must " 'view all the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict,' " *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 113 (3d Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987) (quoting *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir.1979)), and we will

---

**2.** Dr. Theiler later testified that "[b]unionectomies often have lingering discomfort," and, even seven months after surgery, "it was not surprising" that Bohus was experiencing pain and had "bogginess in her soft tissues."

**3.** The jury answered "no" to the following interrogatory: "Do you find that Denise Bohus knew or reasonably should have known before December 31, 1984, that Dr. Beloff's treatment of her caused the problems she was experiencing with her feet?"

affirm the district court's grant of judgment n.o.v. only if the record is "critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief." *Honeywell, Inc. v. American Standards Testing Bureau, Inc.*, 851 F.2d 652, 654 (3d Cir.1988) (citations omitted), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 787 (1989). We review the district court's order granting new trial for abuse of discretion. *United States v. 27.93 Acres of Land*, 924 F.2d 506, 516 (3d Cir.1991).

### III.

We turn first to the question whether the district court properly granted the defendant's motion for judgment n.o.v. At issue is whether the plaintiff's action was barred by the statute of limitations. As we noted in *Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 45 (3d Cir.1990), "state tolling principles are generally to be used by a federal court when it is applying a state limitations period." In this diversity action, therefore, we must look to Pennsylvania law and predict how the Pennsylvania Supreme Court would decide this case. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 464–65, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967); *Tiernan v. Devoe*, 923 F.2d 1024, 1033 (3d Cir.1991). The decisions of the Pennsylvania Superior Court, "while not controlling, are 'indicia of how the [Pennsylvania Supreme Court] might decide' the issue." *McNasby v. Crown Cork & Seal Co., Inc.*, 888 F.2d 270, 281 (3d Cir.1989) (quoting *McGowan v. University of Scranton*, 759 F.2d 287, 291 (3d Cir.1985)), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990).

### A.

The Pennsylvania statute of limitations for medical malpractice actions is two years. 42 Pa.Cons.Stat.Ann. § 5524(2) (Purdon Supp.1991).[4] The statute of limitations begins to run as soon as the underlying cause of action accrues. *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 84, 468 A.2d 468 (1983). Most tort causes of action, including those involving medical malpractice, accrue when the injury is sustained. *Levenson v. Souser*, 384 Pa.Super. 132, 143–44, 557 A.2d 1081, *app. denied*, 524 Pa. 621, 571 A.2d 383 (1989). Once a cause of action has accrued and the statutory period for bringing the action has expired, an injured party is barred from bringing suit unless the statute of limitations has been tolled. *Pocono*, 503 Pa. at 85, 468 A.2d 468.

■ Over the years, Pennsylvania courts have developed certain tolling principles to "ameliorate the sometimes-harsh effects" of the statute of limitations. *Cathcart v. Keene Indus. Insulation*, 324 Pa.Super. 123, 135, 471 A.2d 493 (1984) (in banc); *see Gee v. CBS, Inc.*, 471 F.Supp. 600, 622 (E.D.Pa.), *aff'd*, 612 F.2d 572 (3d Cir.1979). The discovery rule tolls the statute of limitations when a plaintiff, despite the exercise of due diligence, is unable to know of the existence of the injury and its cause. *Pocono*, 503 Pa. at 85, 468 A.2d 468; *Stauffer v. Ebersole*, 385 Pa.Super. 306, 309–11, 560 A.2d 816, *app. denied*, 524 Pa. 622, 571 A.2d 384 (1989).

■ Under the most recent restatement of the discovery rule, the statute of limitations begins to run as soon as "the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Cathcart*, 324 Pa.Super. at 136–37, 471 A.2d 493 (footnote omitted).[5] The

---

**4.** Under 42 Pa.Cons.Stat.Ann. § 5524(2), "[a]n action to recover damages for injuries to the person ... caused by the wrongful act or ... negligence of another" must be commenced within two years.

**5.** Initially, the discovery rule was based on a three-part test set forth in *Volpe v. Johns–Manville Corp.*, 4 P.R.C. 290 (Phil.C.P.1980), and later adopted in *Anthony v. Koppers Co.*, 284 Pa.Super. 81, 425 A.2d 428 (1980), *rev'd on other*

grounds, 496 Pa. 119, 436 A.2d 181 (1981). This test stated that, before the limitations period could begin, a plaintiff must have: "(1) knowledge of the *injury;* (2) knowledge of the *operative* cause of the injury; and (3) knowledge of the *causative relationship* between the injury and the operative cause." *Id.* 284 Pa.Super. at 96, 425 A.2d 428 (quoting *Volpe v. Johns–Manville Corp.*, 4 P.C.R. 290 (Phil.C.P.1980)) (emphasis in original). However, the Pennsylvania Su-

plaintiff need not know the exact medical cause of the injury, *Groover v. Riddle Memorial Hosp.,* 357 Pa.Super. 420, 425, 516 A.2d 53 (1986), *app. denied,* 515 Pa. 600, 528 A.2d 957 (1987); that his injury is due to another's negligent conduct, *Bickford v. Joson,* 368 Pa.Super. 211, 218, 533 A.2d 1029 (1987), *app. denied,* 518 Pa. 647, 544 A.2d 959 (1988); *Held v. Neft,* 352 Pa.Super. 195, 200, 507 A.2d 839 (1986); or that he has a cause of action, *DeMartino v. Albert Einstein Medical Ctr.,* 313 Pa.Super. 492, 502–03, 460 A.2d 295 (1983).

■■■■ The "polestar" of the discovery rule is not the plaintiff's actual knowledge, but rather "whether the knowledge was known, or through the exercise of diligence, knowable to [the] plaintiff." *O'Brien v. Eli Lilly & Co.,* 668 F.2d 704, 711 (3d Cir.1981); *see Pocono,* 503 Pa. at 84, 468 A.2d 468. Every plaintiff has a duty to exercise "reasonable diligence" in ascertaining the existence of the injury and its cause. Although " '[t]here are very few facts which [reasonable] diligence cannot discover, ... there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful.' " *Vernau,* 896 F.2d at 46 (quoting *Deemer v. Weaver,* 324 Pa. 85, 90, 187 A. 215 (1936)). The question whether a plaintiff has exercised reasonable diligence is usually a jury question. *Taylor v. Tukanowicz,* 290 Pa.Super. 581, 586, 435 A.2d 181 (1981). The statute of limitations begins to run as soon as the plaintiff has discovered or, exercising reasonable diligence, should have discovered the injury and its cause. *Stauffer,* 385 Pa.Super. at 309, 560 A.2d 816.

■■■■ As a corollary to the discovery rule, Pennsylvania courts have developed the doctrine of fraudulent concealment. This doctrine tolls the statute of limitations where "through fraud or concealment the defendant causes the plaintiff to relax his vigilance or deviate from the right of inquiry." *Ciccarelli v. Carey Can. Mines, Ltd.,* 757 F.2d 548, 556 (3d Cir.1985).[6] Fraudulent concealment may be intentional or unintentional; however, "mere mistake, misunderstanding, or lack of knowledge is insufficient." *Nesbitt v. Erie Coach Co.,* 416 Pa. 89, 96, 204 A.2d 473 (1964). There must be an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury. *Gee,* 471 F.Supp. at 623. A physician's assurances which "lull a patient into a false sense of security" may constitute fraudulent concealment. *DeMartino,* 313 Pa.Super. at 504, 460 A.2d 295; *see also MacCain v. Montgomery Hosp.,* 396 Pa.Super. 415, 423–24, 578 A.2d 970 (1990), *app. denied,* 527 Pa. 624, 592 A.2d 45 (1991); *Held,* 352 Pa.Super. at 202, 507 A.2d 839. However, "reliance upon the word of one physician when the patient's own common sense should lead one to a different conclusion is unreasonable." *De Martino,* 313 Pa.Super. at 506, 460 A.2d 295. The plaintiff has the burden of proving fraudulent concealment by "clear, precise and convincing" evidence. *Molineux v. Reed,* 516 Pa. 398, 403, 532 A.2d 792 (1987).

■■■■ When fraudulent concealment is established, "the statute [of limitations] is tolled until the plaintiff[ ] knew or using reasonable diligence should have known of

---

perior Court subsequently adopted the two-part standard enunciated in *Cathcart v. Keene Indus. Insulation,* 324 Pa.Super. 123, 471 A.2d 493 (1984), because *Cathcart*'s "rational simplification of the *Volpe* test" makes it acceptable for use in "all 'discovery rule' cases." *Groover v. Riddle Memorial Hosp.,* 357 Pa.Super. 420, 424, 516 A.2d 53 (1986), *app. denied,* 515 Pa. 600, 528 A.2d 957 (1987). As we noted in *Urland v. Merrell–Dow Pharmaceuticals, Inc.,* 822 F.2d 1268, 1271 (3d Cir.1987), the *Cathcart* test has been "widely adopted by Pennsylvania courts" and has been applied in our own decisions. Even though the Pennsylvania Superior Court in *Held v. Neft,* 352 Pa.Super. 195, 507 A.2d 839

(1986), applied the *Volpe* test without reference to *Cathcart,* the district court in this case indicated that the *Held* court's purported use of the three-part test was simply an application of the two-part *Cathcart* test, *Bohus,* slip op. at 12 n. 3, thereby suggesting that the outcome of a case would be the same regardless of which test was applied.

6. Under the doctrine of fraudulent concealment, which arose in equity, the defendant is said to be estopped from asserting a statute-of-limitations defense while the statute is tolled. *See Urland,* 822 F.2d at 1272.

the claim." *Vernau,* 896 F.2d at 46 (quoting *Urland,* 822 F.2d at 1272). In other words, "the Supreme Court [of Pennsylvania] views tolling the statute of limitations in terms of the 'knew or should have known' standard whether the statute is tolled because of the discovery rule *or* because of fraudulent concealment." *Id.* (quoting *Urland,* 822 F.2d at 1273) (emphasis added). Thus, the inquiry under the fraudulent concealment doctrine is the same as that under the discovery rule.[7]

### B.

In determining whether Bohus's claim is barred, we must first decide whether the statute of limitations was tolled, and, if so, under what principle. The jury was instructed on both the discovery rule and the doctrine of fraudulent concealment, but did not specify which principle it relied on in finding that Bohus's action was not barred by the statute of limitations. *See supra* note 3. In granting judgment n.o.v., the district court held that Bohus's claim was barred under both the discovery rule and the fraudulent concealment doctrine. In reaching this conclusion, however, it did not state whether the statute of limitations was ever tolled.[8] Viewing the evidence and all reasonable inferences in the light most favorable to Bohus, we believe the jury could have found that the statute of limitations was tolled under either the discovery rule or the fraudulent concealment doctrine.

■ As we have noted, the discovery rule tolls the statute of limitations whenever the plaintiff, despite the exercise of reasonable diligence, is unable to know of the existence of the injury and its cause. *Pocono,* 503 Pa. at 85, 468 A.2d 468. We believe there is sufficient evidence to support the jury's finding that it was not reasonably possible for Bohus to discover her injury at the time of Dr. Beloff's surgery

or immediately thereafter. Therefore, we conclude the jury could have found that the statute of limitations was initially tolled under the discovery rule.

■ Moreover, we believe the jury could have found that the statute of limitations was initially tolled under the doctrine of fraudulent concealment. As we have noted, fraudulent concealment may be unintentional or intentional, *Nesbitt,* 416 Pa. at 96, 204 A.2d 473; and need only consist of some affirmative and independent act of concealment that would prevent the plaintiff from discovering the injury despite the exercise of reasonable diligence. *Gee,* 471 F.Supp. at 623. It is established that a physician's assurances which lull a patient into a false sense of security may constitute fraudulent concealment. *See, e.g., DeMartino,* 313 Pa.Super. at 504, 460 A.2d 295. Because Dr. Beloff repeatedly assured Bohus that her pain was part of the normal healing process and would eventually subside, we believe the jury could have found "clear, precise and convincing" evidence of fraudulent concealment. *See Molineux,* 516 Pa. at 403, 532 A.2d 792.

■ Having concluded that the statute of limitations was tolled, we must determine how long Bohus was entitled to the continued benefits of tolling. As we have noted, that the statute of limitations is tolled does not mean it is no longer applicable. Whether the statute of limitations is tolled because of the discovery rule or the doctrine of fraudulent concealment, it begins to run as soon as the plaintiff, exercising reasonable diligence, knew or should have known of the injury and its cause. *See Vernau,* 896 F.2d at 46. Our next task, therefore, is to ascertain the point in time when Bohus knew or should have known of her injury and that Dr. Beloff caused it.

---

**7.** *But see Urland,* 822 F.2d at 1277 (Becker, J., dissenting) (arguing that the statute of limitations does not begin to run under the fraudulent concealment doctrine until the plaintiff has *actual* knowledge of the injury).

**8.** In other words, it is unclear whether the district court concluded that the statute of limitations was initially tolled but nevertheless began to run more than two years prior to the commencement of Bohus's action; or that the statute of limitations was never tolled in the first place.

The jury found that Bohus neither "knew [n]or reasonably should have known before December 31, 1984, that Dr. Beloff's treatment of her caused the problems she was experiencing with her feet." In granting judgment n.o.v., however, the district court held that Bohus knew or should have known of her claim when she contacted Dr. Cerciello's office in November, 1984. *Bohus*, slip op. at 16, 18. According to the court, "in the exercise of ordinary diligence, plaintiff should have realized that her post-operative experience was so contrary to her expected course of recovery that something was gravely amiss." *Id.* at 17. Bohus's reliance on Dr. Beloff's assurances that her pain was the result of the normal healing process was unreasonable. *Id.* at 19. "The latest possible time when plaintiff could accurately claim to be relying upon defendant's assurances ... was just prior to her making an appointment with Dr. Cerciello." *Id.* at 18. We disagree.

We believe there is sufficient evidence to support the jury's finding that Bohus neither knew nor should have known of her injury and that Dr. Beloff caused it before December 31, 1984. Dr. Beloff's assertion that the cause of Bohus's deteriorating condition was "readily apparent" in the x-rays he took of her feet on July 3, 1984, cannot serve as the basis for the grant of judgment n.o.v. Relying on these x-rays, neither Dr. Beloff nor Drs. Zuckerman and Theiler diagnosed Bohus's metatarus primus varus deformity, which caused her bunions to recur.

We find inapposite the defendant's analogy to *Bickford v. Joson*, 368 Pa.Super. at 211, 533 A.2d 1029. In *Bickford* the court held that the plaintiff's medical malpractice claim was barred by the statute of limitations, in part, because "it [was] clear that the injury-failure to alleviate or reverse paralysis-was obvious to [the plaintiff] who had knowledge of the continued gravity of his paralysis with only slight improvement from the time he left the hospital." *Id.* at 215, 533 A.2d 1029. We question whether Bohus's injury was as "obvious." In any event, we believe it sufficient to note that, unlike the plaintiff in *Bickford* who received no assurances from the defendant/doctor, Bohus was repeatedly assured by Dr. Beloff that her pain was part of the normal healing process and would eventually subside.

Although the deteriorating condition of Bohus's feet could have led her to question the validity of Dr. Beloff's prognosis, we believe the jury could have found that Bohus reasonably relied on Dr. Beloff's assurances. There was no reason for Bohus to challenge Dr. Beloff's prognosis in the six months following her surgery. Once it became clear that her pain was worsening rather than subsiding, we believe the jury could have found that Bohus exercised reasonable diligence by seeking additional medical opinions.

The first two doctors Bohus consulted said nothing that should have awakened Bohus's suspicions or intensified her inquiry. To the contrary, Drs. Zuckerman and Theiler confirmed Dr. Beloff's prognosis. Dr. Zuckerman informed Bohus that Dr. Beloff's treatment was "reasonable." Dr. Theiler told Bohus that the pain she was experiencing was normal and would subside in time. Indeed, he later testified that "[b]unionectomies often have lingering discomfort."

This case is therefore distinguishable from *MacCain v. Montgomery Hospital*, 396 Pa.Super. 415, 578 A.2d 970 (1990), and *DeMartino v. Albert Einstein Medical Center*, 313 Pa.Super. at 492, 460 A.2d 295, where the court found that the plaintiffs were put on notice of their injuries by statements made by physicians they consulted after leaving the defendant/doctors' care. In *MacCain*, a cancer detection case, the first doctor consulted "told [the plaintiff] he did 'not like the looks of [the mammogram],'" which had been diagnosed as "negative" by the defendant/doctor, and the second doctor informed her "that maybe [the defendant/doctor] did not look at the mammogram right." 396 Pa.Super. at 420, 578 A.2d 970. Likewise, in *DeMartino*, a dental malpractice case, the doctor consulted informed the plaintiff that "whoever had done the root canal 'could not

have been watching what he was doing.'" 313 Pa.Super. at 496, 460 A.2d 295.[9]

Unlike the plaintiffs in *MacCain* and *De-Martino*, Bohus was given no reason to doubt Dr. Beloff's prognosis by the physicians she consulted until January, 1985, when Dr. Cerciello suggested that Dr. Beloff had done something wrong and inquired whether she had a lawyer. That Bohus's pain became so acute she was unable to wear footwear and experienced constant discomfort before she was examined by Dr. Cerciello does not alter our conclusion. We believe there is sufficient evidence from which the jury could have found that Bohus exercised reasonable diligence in attempting to discover the existence of her injury and its cause.

This case is therefore closer to *Corbett v. Weisband*, 380 Pa.Super. 292, 551 A.2d 1059 (1988), *app. denied*, 524 Pa. 607, 569 A.2d 1367 (1989), and *Taylor v. Tukanowicz*, 290 Pa.Super. at 581, 435 A.2d 181. In *Corbett* the plaintiff, after undergoing a knee fusion, contracted an infection in her knee which continued unabated. Following the procedure, the defendant/doctor repeatedly diagnosed the plaintiff's condition as "stable," and this prognosis was confirmed by another doctor consulted by the plaintiff. The leg was eventually amputated. Nevertheless, the court upheld the trial court's denial of judgment n.o.v. on the ground that there was ample evidence from which the jury could have found that the plaintiff "was justified in not having discovered her injury." 380 Pa.Super. at 306–11, 551 A.2d 1059.

In *Taylor* the court reversed the grant of summary judgment for the defendant on facts similar to those before us. After the plaintiff underwent back surgery in April, 1972, he was told by his doctor that he would be able to return to work within a few months. The plaintiff's condition gradually worsened to the point that he was declared totally disabled by the Social Security Administration in "late 1972." In November, 1972, the plaintiff began seeking treatment from "numerous" other doctors. Surgery was performed on his back again in "late 1973 or early 1974." Eventually, the plaintiff brought a medical malpractice action in September, 1976, shortly after his attorney advised him that he received improper care. The court allowed the action to proceed on the ground that "there exists a genuine issue as to when his discovery of his injury was reasonably possible." 290 Pa.Super. at 587, 435 A.2d 181.

Like the plaintiffs in *Corbett* and *Taylor*, we believe the jury could have found that Bohus did everything reasonably possible to discover her injury and that Dr. Beloff caused it. In reaching the opposite conclusion, the district court relied primarily on *Held v. Neft*, 352 Pa.Super. at 195, 507 A.2d 839. In *Held* the plaintiff suffered injury to her arm as a result of an intervenous procedure administered during the course of an operation in December, 1979. Immediately following the operation, the plaintiff suffered intense pain in her arm. The defendant/doctor who administered her post-operative treatment told the plaintiff that the pain was caused "by the intervenous needle which had been poked into her hand several times, and that such a thing happens after surgery." *Id.* at 198, 507 A.2d 839.

Although the plaintiff's pain eventually subsided, her arm never fully regained its strength. In May, 1980, after the pain had gone away, the plaintiff left the defendant's care. Two years later, the plaintiff learned that it was not the needle that had caused the weakening of her arm, but rather the medication which was administered by the anesthesiologist. The plaintiff brought suit in December, 1982.

The court held that the statute of limitations began to run as soon as the plaintiff

---

**9.** *See also Groover v. Riddle Memorial Hosp.*, 357 Pa.Super. at 420, 516 A.2d 53. Unlike the instant case, in *Groover* the doctors consulted did not advise the plaintiff that the pain she was experiencing was "normal." Rather, they simply informed the plaintiff that they were unable to diagnose the precise cause of her injury. According to the court, "common sense" should have led the plaintiff to discover her injury in light of the doctors' reactions to her condition. *Id.* at 428–29, 516 A.2d 53.

left the defendant's care in May, 1980, and that her claim was barred. According to the court, "[h]aving lost confidence in her own doctor's ability to treat her in May of 1980, ... the proper course for her would have been to exercise diligence at that time and seek further professional advice to ascertain the true cause of her injury." *Id.* at 203, 507 A.2d 839. Had she sought such advice, the court reasoned, she would have discovered the cause of her injury, because in December, 1979, the anesthesiologist wrote in the plaintiff's medical records that her pain was " 'most likely' due to the irritating effects of the medication." *Id.* at 198, 507 A.2d 839.

According to the district court, "the factual testimony adduced in this case, viewed objectively, presents an even stronger situation than existed in *Held* for the conclusion that plaintiff, in fact, lost confidence in defendant at the time of her last postoperative visit, thereby rendering unreasonable her continued reliance upon defendant's assurances regarding future recovery." *Bohus,* slip op. at 20–21. We disagree.

As we have noted, we believe there was sufficient evidence from which the jury could have found that Bohus's injury and its cause were not discoverable before December 31, 1984. In *Held* the court emphasized that, had the plaintiff exercised reasonable diligence, she could have discovered her injury as early as December, 1979, when the anesthesiologist noted in the plaintiff's medical records that her injury was caused by the medication. 352 Pa.Super. at 202–03, 507 A.2d 839. In this case, however, there was no written, uncontroverted documentation detailing the true cause of Bohus's injury which she could have discovered prior to her visit with Dr. Cerciello.

More importantly, Bohus sought additional medical opinions. After leaving the defendant's care, the plaintiff in *Held* stated "that she had no cause to seek further medical care at that time because [her pain] had subsided." *Id.* at 199, 507 A.2d 839. The *Held* court opined that "the proper course for her would have been to exercise

due diligence at [the time she left the defendant's care] and seek further professional advice to ascertain the true cause of her injury." *Id.* at 203, 507 A.2d 839. By contrast, after leaving Dr. Beloff's care in August, 1984, Bohus immediately sought other medical opinions—the proper course of action according to *Held.* Moreover, the opinions she received corroborated Dr. Beloff's prognosis.

Finally, as we have noted, we believe the jury could have found that Bohus's reliance on Dr. Beloff's assurances was reasonable. The *Held* court found that the plaintiff's reliance on the defendant's assurances became unreasonable as soon as she lost confidence in the defendant's professional ability. *Id.* at 202, 507 A.2d 839. The court determined that the plaintiff lost confidence in the defendant based on her own testimony that the defendant didn't have her "best interests at heart" and that he "was not a very good surgeon," as well as the plaintiff's decision to leave the defendant's care. *Id.* at 201–02, 507 A.2d 839.

We cannot agree with the district court that, as a matter of law, it is "clear" Bohus's decision to leave Dr. Beloff's care was "closely connected to her claimed injury" and loss of confidence in Dr. Beloff's professional ability. *Bohus,* slip op. at 19. Bohus's decision to seek additional medical opinions may have been motivated as much by her desire to obtain another work release as by a loss of confidence in Dr. Beloff. Whatever Bohus's motive in consulting other doctors, because Drs. Zuckerman and Theiler confirmed Dr. Beloff's prognosis, we believe the jury could have found that Bohus was justified in relying on Dr. Beloff's assurances.

██ The district court's contrary conclusion fails to take into account that lay persons should not be charged with greater knowledge of their physical condition than that possessed by the physicians on whose advice they must rely. *See Trieschock v. Owens Corning Fiberglas Co.,* 354 Pa.Super. 263, 268, 511 A.2d 863 (1986); *Stauf-*

*fer*, 385 Pa.Super. at 311, 560 A.2d 816.[10] There is indeed some point in time when a patient's own "common sense" should lead her to conclude that it is no longer reasonable to rely on the assurances of her doctor. *See De Martino*, 313 Pa.Super. at 506, 460 A.2d 295. In ascertaining this point in time, however, we are mindful that "[t]o put upon [a patient] the duty of knowing the nature of her ailment and its relation to her prior treatment before it is ascertained with a degree of certainty by the medical profession is a great burden to impose upon her." *Stauffer*, 385 Pa.Super. at 311, 560 A.2d 816.

In sum, viewing the evidence and all reasonable inferences in the light most favorable to Bohus, we believe the jury could have found that Bohus neither knew nor should have known of her injury and that Dr. Beloff caused it before December 31, 1984. Because Bohus filed suit within two years of that date, her action is not barred by the statute of limitations. Therefore, we conclude that the district court improperly granted judgment n.o.v.

## IV.

We turn now to the question whether the district court properly granted the defendant's motion for new trial under Fed. R.Civ.P. 60(b).[11] As we have noted, we review the district court's order granting new trial for abuse of discretion. *27.93 Acres of Land*, 924 F.2d at 516.

■■■■ Under Rule 60(b)(2), the term "newly discovered evidence" refers to "evidence of facts in existence at the time of trial of which the aggrieved party was excusably ignorant." *Id.* A party is entitled to new trial only if such evidence is (1) material and not merely cumulative, (2) could not have been discovered prior to

trial through the exercise of reasonable diligence, *and* (3) would probably have changed the outcome of the trial. *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir.1983); *Ulloa v. City of Philadelphia*, 692 F.Supp. 481, 483 (E.D.Pa.1988).

■■■ The movant under Rule 60(b) "bears a heavy burden," *Plisco v. Union R. Co.*, 379 F.2d 15, 17 (3d Cir.1967), *cert. denied*, 389 U.S. 1014, 88 S.Ct. 590, 19 L.Ed.2d 660 (1967), which requires "more than a showing of the potential significance of the new evidence." *Id.* at 16. We view Rule 60(b) motions as "extraordinary relief which should be granted only where extraordinary justifying circumstances are present." *Id.; see also Moolenaar v. Government of the Virgin Islands*, 822 F.2d 1342, 1346 (3d Cir.1987).

■■■ The newly discovered evidence here concerns Bohus's failure to disclose that she was examined by Dr. Zuckerman on August 2, 1984, in both her answers to Dr. Beloff's interrogatories and her deposition.[12] This evidence came to light in April, 1989, when Dr. Zuckerman contacted Dr. Beloff after reading a newspaper article on the outcome of the trial. It is undisputed that this evidence was in existence at the time of trial.

The district court found that the newly discovered evidence "could have altered the jury's finding of fact with respect to the statute of limitations question." *Bohus*, slip op. at 10. We disagree. That Bohus visited Dr. Zuckerman after leaving Dr. Beloff's care bolsters the argument that she exercised reasonable diligence in attempting to discover the existence of her injury and its cause. Moreover, the opinion Dr. Zuckerman rendered during this visit—

---

**10.** Dr. Beloff argues that these cases are inapposite on the grounds that *Trieschock* is a "creeping disease" case and in *Stauffer* the treating doctor's diagnosis was "speculative." However, we believe the principles enunciated in *Trieschock* and *Stauffer* are applicable here, where a plaintiff seeks additional medical advice which confirms the defendant/doctor's prognosis.

**11.** Fed.R.Civ.P. 60(b) provides, in pertinent part:

[T]he court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b).

**12.** *See supra* note 1.

that Dr. Beloff's treatment was "reasonable"—supports Bohus's position that her reliance on Dr. Beloff's assurances was reasonable.[13] For these reasons, we believe the newly discovered evidence strengthens—not weakens—Bohus's case, and, therefore, would not have changed the outcome of the trial.[14]

Thus, we conclude that the district court abused its discretion in granting Dr. Beloff's motion for new trial under Rule 60(b). In so holding, we do not condone Bohus's inexcusable "innocent failure of recollection" with respect to Dr. Zuckerman's examination. Rather, we base our determination on the fact that the record is devoid of the "extraordinary justifying circumstances" necessary to warrant the grant of new trial.

## V.

We conclude that the district court erred in granting judgment n.o.v. with respect to the statute-of-limitations question, and abused its discretion in granting new trial based on newly discovered evidence. Therefore, we will reverse the district court's order and reinstate the jury's verdict for the plaintiff.

---

**13.** We find unpersuasive Dr. Beloff's contention that, had the newly discovered evidence come to light before trial, he could have established that by the time Bohus was examined by Dr. Cerciello she was in fact relying on Drs. Zuckerman's and Theiler's assurances—not Dr. Beloff's. As we have explained, that Drs. Zuckerman and Theiler confirmed Dr. Beloff's prognosis makes Bohus's reliance Dr. Beloff's assurances all the more reasonable.

**14.** Because we find that the newly discovered evidence would not have altered the outcome of the trial, we do not consider whether the evidence was material and not cumulative or could have been discovered prior to trial through the exercise of reasonable diligence. *See Stridiron,* 698 F.2d at 207.