AMBRO, Circuit Judge,
concurring in part and dissenting in part.
I. Introduction
I agree with the majority that these appeals raise important issues involving when a doctor’s statements about (or even a diagnosis of) a plaintiffs illness in a latent injury case toll the statute of limitations under the discovery rule. According to well-settled precedent, the statute of limitations begins to run as soon as a plaintiff knows, or reasonably should know, that she has been injured and that her injury has been caused by another party’s conduct. Bohus v. Beloff, 950 F.2d 919, 924 (3d Cir.1991) (citing Cathcart v. Keene Indus. Insulation, 324 Pa.Super. 123, 471 A.2d 493, 500 (1984)). “The plaintiff need not know the exact medical cause of the injury; that his injury is due to another’s negligent conduct; or that he has a cause of action.” Bohus, 950 F.2d at 924-25 (internal citations omitted). Rather than actual knowledge, “[t]he ‘polestar’ is ... ‘whether the knowledge was known, or through the exercise of diligence, knowable to [the] plaintiff.’ ” Bohus, 950 F.2d at 925 (quoting O’Brien v. Eli Lilly & Co., 668 F.2d 704, 711 (3d Cir.1981)). To that end, “[e]very plaintiff has a duty to exercise ‘reasonable diligence’ in ascertaining the existence of the injury and its cause.” Bohus, 950 F.2d at 925.
The Pennsylvania Supreme Court has defined “reasonable diligence” as
*141 a reasonable effort to discover the cause of an injury under the facts and eircumstance[s] present in the case. Long ago we recognized that “[tjhere are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful.”
Cochran v. GAF Corporation, 542 Pa. 210, 666 A.2d 245, 249 (1995) (internal citations omitted). Reasonable diligence is an objective standard. Id. A plaintiff “must exercise only the level of diligence that a reasonable man would employ under the facts and circumstances presented in a particular case.” Id. “[A] diligent investigation may require one to seek further medical examination as well as competent legal representation.” Id. (citations omitted).
While “whether a plaintiff has exercised reasonable diligence is usually a jury question,” Bohus, 950 F.2d at 925 (citation omitted),
[tjhere is indeed some point in time when a patient’s own “common sense” should lead her to conclude that it is no longer reasonable to rely on the assurances of her doctor. In ascertaining this point in time, however, we are mindful that “[tjo put upon [a patient] the duty of knowing the nature of her ailment and its relation to her prior treatment before it is ascertained with a degree of certainty by the medical profession is a great burden to impose upon her.”
Id. at 930 (internal citations omitted). More succinctly, “ ‘reliance upon the word of one physician when the patient’s own common sense should lead to a different conclusion is unreasonable.’ ” Id. at 925 (quoting DeMartino v. Albert Einstein Medical Center, 313 Pa.Super. 492, 506, 460 A.2d 295 (1983)).
These principles of Pennsylvania law, when applied to the varied facts of these cases, lead to differing results. Despite physicians’ statements pointing to or diagnoses of illnesses other than chronic beryllium disease (“CBD”), many of the plaintiffs still strongly suspected or had notice their extended exposure to the defendants’ beryllium plant was the source (or cause) of their various lung ailments. For those plaintiffs, the time to sue began and they were required within that time to exercise reasonable diligence to discover the true cause of their health problems and to file suit to protect their legal rights. The limitations clock stopped if a doctor’s diagnosis or statements affirmatively dissuaded due diligence from being exercised by a putative plaintiff and that inaction did not run counter to common sense.
Put another way, if a plaintiff had symptoms of lung disease, and had reason to believe the defendants’ beryllium plant caused that injury — whether the information was obtained from a doctor, medical study, government letter, or possibly a media story — the statute of limitations began to run. Pennsylvania’s discovery rule tolled the limitations period only if a physician definitively informed a plaintiff that she did not have an illness caused by beryllium (and, a fortiori, the defendants’ plant) and common sense did not make her reliance unreasonable.
In this context, I join fully the majority’s opinion as to John Branco, concur in the result reached as to Geneva Bare and Mary Russo, and dissent as to Jane De-biec. Although I would only decide one case differently than the majority (Debiec), I believe the facts of another (Russo) are closer than the majority acknowledges.
II. Application of Pennsylvania Law to Debiec Case
The majority examines Jane Debiec’s health history at great length but, in doing *142 so, disproportionately relies (in my view) on the diagnosis of her treating physician, Dr. John Shuman. The majority notes Dr. Shuman diagnosed Mrs. Debiec with sar-coidosis in 1978, told her it was unlikely the cause was beryllium, and maintained this diagnosis until her death in April 2000. Although there is no evidence that Mrs. Debiec made any further effort to investigate what caused her sarcoidosis during the interim two decades- — despite her husband’s publicly expressed belief during this time that it-was caused by the defendants’ plant — the majority concludes reasonable minds could differ as to whether Mrs. De-biec exercised reasonable diligence in discovering the cause of her injury. I do not agree.
As an initial matter, while Dr. Shuman did inform Mrs. Debiec many years ago it was unlikely her illness was caused by beryllium, the record does not indicate he continued to assure her over the years that the defendants’ plant was not the source of her sarcoidosis. Dr. Shuman recommended Mrs. Debiec undergo a lung biopsy in 1978 when she was experiencing respiratory difficulty during her second pregnancy. In his deposition testimony, taken in February 2002, Dr. Shuman stated that he ordered the biopsy tissue tested for beryllium because he was aware she was living near the defendants’ plant. The test revealed beryllium in her lung tissue, but not in amounts significant enough to consider diagnosing Mrs. Debiec with beryllium-induced lung disease, although Dr. Shuman stated he could not rule it out as a possibility. Besides an unheeded recommendation in 1980 to seek a second opinion whether zirconium was the cause of Mrs. Debiec’s sarcoidosis (in response to Mr. Debiec’s questioning on this point), there is no evidence that Dr. Shuman at any time in the succeeding twenty years again considered or discussed, much less rejected, the possibility of a causal connection between the defendants’ plant and Mrs. Debiec’s declining health. In fact, Dr. Shuman testified he did not recall Mr. Debiec ever directly asking him if his wife’s condition was caused by the defendants’ plant, and was even surprised when he learned at Mrs. Debiec’s funeral that Mr. Debiec suspected as much.[1]
But while Dr. Shuman may have had no reason to revisit his initial diagnosis that Mrs. Debiec’s sarcoidosis was unrelated to beryllium, she had ample facts to suspect her illness was caused by exposure to the defendants’ plant. In June 1990, John De-biec, Mr. Debiec’s brother, wrote a research paper while at Pennsylvania State University titled “The Environmental Impact of the NGK Metals Facility on the Local Community.” The paper anonymously referred to Mrs. Debiec’s case and mentioned that, because she lived near the defendants’ beryllium plant, she may actually suffer from CBD, not sarcoidosis, and hypothesized her case indicated a relationship between sarcoidosis and CBD. John Debiec also attached to the paper a copy of his sister-in-law’s biopsy report with her name redacted. John Debiec testified in his deposition that at the time he wrote the report he suspected emissions from the defendants’ plant caused Mrs. Debiec’s condition and that he shared his belief with Mr. Debiec, but not Mrs. Debiec.
On July 22, 1992, the Environmental Protection Agency (EPA) held a public meeting in Muhlenberg, Pennsylvania, re *143 garding health issues and the defendants’ plant. Jane, Michael, and John Debiec all attended. The transcript of the meeting indicates Michael Debiec (Mrs. Debiec’s husband) asked the following:
Does the NGK Company have any — in this plan of recovery and fixing, are they going to make any restitution to people who probably have grieved [sic] this since the 1950s and ’60s and have been seriously ill with some type of disease that’s caused by beryllium, cadmium, or anything else?
Mr. Debiec also stated that
... I have been doing research on this for many years because my wife is seriously ill with a disease called sar-coidosis. And she lived in Temple. And I [have] done research for ten years, and I found out through different doctors that there’s only one known cause of sarcoidosis and pulmonary interstitialitis. And that comes from beryllium.
In October 1993, Mr. Debiec wrote a letter to the Agency for Toxic Substances and Disease Registry (ATSDR), apparently in response to his having reviewed a copy of its draft report. His letter strongly criticized the ATSDR’s investigatory effort to find a causal connection between the defendants’ plant and the illnesses of local residents.
I hope this is the last letter I have to write to any government agency concerning my wife’s illness and the adverse effects of Beryllium plants across the United States.
I’m appalled and shocked that your investigative team could not come up with any other residents who are suffering from Beryllium related illness or who may have died as a result of Beryllium poisoning.
í¡í :¡í & sj:
I’m tired of relating my wife’s case to prove breathing Beryllium Oxide is extremely hazardous to one’s health. She lived half a mile from the NGK plant on [redacted] in Temple for half of her life. She breathed the air and played in the dry dirt. At the age of thirty-four she has one-third breathing capacity compared to a normal adult. A biopsy of her lungs shows that she has Beryllium in her lungs. How much Beryllium dust does it take for a person to lose two-thirds of their [sic] breathing capacity?
* * * % * sfr
In my opinion, the bottom line is this, if your team had done an adequate investigative job, interviewing the right people, the report should have stated that the residents of Muhlen-berg Township who live within a radius of five miles from the NGK plant are getting ill, have been getting ill and will continue to get ill. They may not get a breathing disorder such as Sarcoidosis or Berylliosis. Brain tumors and certain cancers have become prevalent to some residents who live near the plant.
The final ATSDR report on the Reading plant was released in June 1995, and stated that “since CBD mimics the symptoms of sarcoidosis and may readily be confused with the latter disease, it is possible that additional, undiagnosed cases of CBD, masquerading as sarcoidosis, have occurred.” The report also recommended that “long-term residents who have been diagnosed as having sarcoidosis and who suspect that they may have been exposed to clinically significant levels of beryllium in the past may want to consider consult *144 ing an occupational/environmental medicine specialist who can determine whether specialized testing for beryllium sensitivity is appropriate.”
The majority cites portions of this same evidence and concludes it proves only that Mr. Debiec and his brother suspected Mrs. Debiec’s condition was beryllium-related, but she did not agree, and opted instead to rely on Dr. Shuman’s diagnosis. But whether Mrs. Debiec agreed with her husband is not relevant. “[Tjhere are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which would be successful.” Cochran, 666 A.2d at 249 (internal citation omitted). Layer upon layer of strong evidence compiled by Mr. Debiec and his brother, acquired in part from Government sources, demanded Mrs. Debiec exercise reasonable diligence to investigate further. A “diligent investigation may require one to seek further medical examination as well as competent legal representation,” id., and Mrs. Debiec sought neither.
I agree with the majority that usually a claimant may rely on the assurances of her doctor instead of the suspicions of her spouse. But that is not what happened here. There is no evidence that, in the twenty years after Dr. Shuman first told Mrs. Debiec it was unlikely her sarcoidosis was caused by beryllium, he ever reiterated this opinion in response to an inquiry based on the growing body of evidence to the contrary. While the discovery rule may have tolled the clock initially, “that the statute of limitations is tolled does not mean it is no longer applicable.” Bohus, 950 F.2d at 926. The record overwhelmingly demonstrates that by the mid-1990s Mr. Debiec believed (and Mrs. Debiec knew of this belief), on the basis of his extensive information-gathering, that his wife’s illness was beryllium-induced and was caused by the defendants’ plant. Mrs. Debiec chose to ignore this information and engaged in no further investigation. It is possible she merely wanted to enjoy her remaining years free from the burdens of a prolonged search into the cause of her illness. This was her prerogative, but reasonable diligence is an objective, not subjective standard. See Cochran, 666 A.2d at 249. Although Dr. Shuman never altered his original diagnosis, in later years, when sources such as the ATSDR were advising that CBD may masquerade as sarcoidosis, Mrs. Debiec no longer could ignore that the defendants’ beryllium plant may have been the cause of her injury. Indeed, even if we ignore all the warnings of her illness’ source prior to the ATSDR report, it alone triggered the two-year limitations period in which to attend to her legal rights.
The District Court concluded the facts are so clear in this case that reasonable minds cannot differ on the question whether Mrs. Debiec exercised reasonable diligence in attempting to discover the cause of her injury. Mr. Debiec filed suit on behalf of his wife on May 29, 2001, nearly eight years (under the most generous interpretation) after she knew or should have known of the defendants’ alleged involvement in causing her illness. Accordingly, I would affirm the District Court’s ruling that this suit is time barred.
III. Other Plaintiffs
I concur in the result reached by the majority in the case of Geneva Bare, who died on November 2, 2000. Suit was filed by her daughter and administratrix, Sharon Reeser, on June 6, 2001. The District Court relied almost entirely on the fact that Judith Forry, another of Bare’s daughters, testified in her deposition that during a doctor visit in the mid-1990s Bare, having read an article on the topic in *145 the local newspaper, asked whether her lung disease could be due to beryllium exposure. But, as noted by the majority, the District Court ignored related testimony by Forry that she could not accurately recall the date of this conversation, and allowed that it may have taken place in the late 1990s. Accordingly, the disputed fact issue — 'the date when Bare received notice that the defendants’ plant may have been the cause of her injury — should be decided by a jury.
I concur also in the result reached as to Mary Russo, but I believe her case is closer than the majority acknowledges. Contrary to the majority’s factual analysis, Mrs. Russo’s doctors never definitively diagnosed her as not having CBD, much less did they dispel her concern that the defendants’ plant was the cause of her injury. Dr. Bell diagnosed her with idiopathic pulmonary fibrosis of an unknown nature, and told her it was unlikely her illness was due to her employment at the facility five decades ago. Dr. Mengel confirmed this diagnosis. But there is no evidence any doctor told Mrs. Russo her injury was not caused by her many years of living and working near the defendants’ plant, as she evidently suspected. According to Mrs. Russo, “I wasn’t happy with that” explanation. “It bothered me because I heard people that didn’t even work there had this. They didn’t even have to work at [the] plant.” Mrs. Russo’s suspicion of nonoccupational CBD was derived from information she received from her local newspaper. While her doctors may not have shared her concern, these articles gave Mrs. Russo adequate information for her to propose to them that she undergo a medical procedure that in the end confirmed her suspicions were correct. Ultimately, however, I do not believe the facts are so clear that reasonable minds cannot differ as to when the limitations period began. Although the March 29, 1999, and April 12, 1999, newspaper articles provide some persuasive evidence Mrs. Russo had notice of the cause of her injury prior to May 29,1999— two years before she filed suit — this is too slim a reed on which to rest entirely a finding that her suit is time barred.
As noted above, I join fully the decision concerning John Branco, and thus have nothing further to add.
IV. Conclusion
As noted by the majority, in this diversity action our task is to look to Pennsylvania law and predict how the Pennsylvania Supreme Court would decide the case. Bohus, 950 F.2d at 924. To that end, the Pennsylvania Supreme Court has cautioned against adopting an approach that “would dramatically expand the discovery rule and open the flood gates to allow anyone with a good faith lack of diligence to claim the benefit of the rule.” Cochran, 666 A.2d at 250. In this context, while I concur in varying degrees with the determinations of the majority as to plaintiffs Bare, Russo and Branco, I disagree as to Mrs. Debiec. In her case, the majority assigns more importance that would I to Dr. Shuman’s 1978 misdiagnosis and less importance than would I to the myriad later events pointing' — strongly and clearly — -to beryllium (and thus the defendants) as the cause of her condition. The majority holds it is a jury question whether the statute of limitations is tolled until Mrs. Debiec received a positive diagnosis of CBD, even if the prior non-CBD diagnosis did not prevent her — by exercising minimal diligence amidst the wave of information gathered by, inter alia, her husband — from learning the cause of her injury. I do not believe this departure from settled precedent would be endorsed by the Pennsylvania Supreme Court, which “ha[s] not hesitated to find as a matter of law that a party has not used reasonable *146 diligence in ascertaining the cause of an injury[,] thus barring the party from asserting [that] claim under the discovery rule.” Id. at 248. Therefore, I respectfully dissent with respect to the majority’s determination as to Mrs. Debiec.

. In response to a question about whether Mr. Debiec, or anyone else on his behalf, ever asked Dr. Shuman if Mrs. Debiec’s condition was caused by the defendants' plant, Dr. Shu-man replied: "I don't recall anybody asking me that. I subsequently became aware that he was thinking that and that was at her funeral, which sort of caught me off guard. I didn’t realize that he thought about it that strongly.”