**William E. CICCARELLI, Donald J. Cline, Plaintiffs,**

v.

**GICHNER SYSTEMS GROUP, INC., The Union Corporation, Charles E. Atwood, II, Defendants.**

**Civ. A. No. 1:CV–93–643.**

United States District Court, M.D. Pennsylvania.

Sept. 6, 1994.

Alvin B. Lewis, Jr., Hartman Underhill & Brubaker, Lancaster, PA, James Ulwick, Kramon & Graham, Baltimore, MD, David A. Flores, Harmon & Davies, P.C., Lancaster, PA, for plaintiffs William E. Ciccarelli, Donald J. Cline.

Stephen Aloysius Moore, Stephen A. Moore, Glenn P. Heisey, McNees, Wallace & Nurick, Harrisburg, PA, Thomas D. Yannucci, Eugene F. Assaf, Kurt B. Olsen, Kirkland & Ellis, Washington, DC, for defendants Gichner Systems Group, Inc., Charles E. Atwood, II.

Charles W. Rubendall, II, Keefer, Wood, Allen and Rahal, Harrisburg, PA, Jeffrey W. King, King, Pagano & Harrison, Washington, DC, Jeffrey W. Pagano, King, Pagano &

Harrison, New York City, Keith J. Harrison, King, Pagano & Harrison, Washington, DC, for defendant Union Corp.

*MEMORANDUM*

CALDWELL, District Judge.

There remain pending in this case three motions for summary judgment. In our Memorandum and Order of July 28, 1994, we allowed the parties to file briefs addressing two issues critical to our review of the motions. That briefing is now complete and this memorandum will resolve the motions.

## I. *Facts and Procedural History*

In 1967, Plaintiffs William Ciccarelli and Donald Cline founded Gichner Mobile Systems of Pennsylvania ("GMS"), a company that designed and built military and commercial enclosures and shelters. In 1968, The Union Corporation ("Union") bought GMS and began to operate it as a division of Union. Ciccarelli served as division president until he retired in 1987; Cline served as division vice president until he left the company in 1989. In April, 1989, a group of investors, including Plaintiffs, entered into a leveraged buyout of the GMS division and created Gichner Systems Group ("Gichner").

Gichner, while a part of Union and after, had several federal government contracts. In July, 1989, the Defense Contract Audit Agency ("DCAA") began an audit of certain government contracts and, as a result, in March, 1991, asked Union to explain alleged pricing discrepancies.[1] Union then asked Gichner to assist in the investigation. Union ultimately concluded that Plaintiffs had inflated prices on the government contracts.

### A. *Union Retirement Agreements*

During their employment at GMS, while it was a division of Union, Plaintiffs both signed agreements with Union that provided for supplemental retirement benefits. Ciccarelli signed his on July 1, 1978. It provided that

Employee agrees that, during the term of employment, he will serve the Company faithfully and will devote his best efforts to the business of the Company and to the promotion, advancement, and successful conduct thereof.

In exchange, Ciccarelli would receive compensation while he worked and $500 a month in deferred compensation when he retired or reached 65 years of age, whichever was later. Cline signed his agreement on January 31, 1986. It provided that

(a) Upon Employee's retirement from the Company's employ or upon attainment of age 65 (whichever last occurs) and further provided that Employee has not violated any of the provisions of this Agreement, the Company shall pay to Employee ... an annual amount equal to twenty-one percent plus one percent for each additional year of service (and fractions thereof) of service to the Company after February 1, 1988 multiplied by the greater of [the salary average of the last three years or the average salary of the last three years of employment].

\* \* \* \* \* \*

(c) It is specifically agreed and understood that the Supplemental Retirement Benefit hereunder is forfeitable by Employee, and the Company shall have no obligation therefor, in the event Employee voluntarily severs employment ...

When he retired in 1987, Ciccarelli began receiving payments from Union under the supplemental retirement agreement. In June, 1991, because it believed that Plaintiffs had been involved in fraudulent conduct, Union terminated payments to Ciccarelli.

On March 9, 1992, Cline reached age 65, but Union declined to make payment to him under the supplemental retirement agreement, claiming he had voluntarily left Union's employ and had engaged in fraudulent conduct.

---

1. The contracts in question were ones in which Gichner had acted as a subcontractor to the Raytheon Corporation ("Raytheon") in the design and manufacture of the Patriot missile system.

### B. *Gichner Termination*

At the time of the leveraged buyout of Gichner in 1989, Plaintiffs agreed to become executives of the new company and they signed senior management agreements. Ciccarelli became president and chief executive officer and Cline became vice president of marketing.

After the DCAA began investigating the government contracts and Union so notified Gichner, Gichner's board of directors engaged the law firm of Morgan, Lewis & Bockius to conduct an internal investigation. On May 2, 1991, the Gichner board suspended Plaintiffs from their employment and, on May 29, 1991, notified them that they had been discharged.

On April 30, 1993, Plaintiffs brought a 24–count lawsuit against Gichner and Union. Gichner answered and asserted 15 counterclaims, while Union answered and set forth 11 counterclaims.

By order of September 1, 1993, we dismissed Counts VII, VIII, and XI through XXIV of the complaint and Counts I and II of Gichner's counterclaim. By order of July 28, 1994, we denied certain motions for summary judgment by Plaintiffs and by Gichner and allowed the parties to file additional briefs with regard to two issues central to the remaining three motions for summary judgment. That briefing is now complete and the pending issues and motions are ripe for resolution.[2]

### II. *Law and Discussion*

The two issues on which we invited briefing were (1) whether Plaintiffs' first two counts should be liberally construed as pleading claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1010, *et seq.* and (2) whether the affidavit of James Woodend is competent evidence.

### A. *Counts I and II*

▮ In our Memorandum and Order of July 28, 1994, we ordered Plaintiffs and Union to brief the question of whether Union

would suffer significant prejudice if we construed the first two counts of the amended complaint to state claims under 29 U.S.C. § 1132(a)(1)(B), the ERISA provision allowing actions to recover benefits due. We did this because the literal language of those counts was as follows:

63. Pursuant to the terms of the July 1, 1978 [January 31, 1986, for Mr. Cline] Agreement between Ciccarelli and Union, and subsequent amendments thereto, Union owed and continues to owe a fiduciary duty to provide Ciccarelli with the supplemental retirement benefits and other employment benefits for which he had bargained as a Union employee.

64. Union, by and through its agents, servants, and/or employees, breached its fiduciary duties under ERISA by acting in an arbitrary and capricious manner and by failing to act in such a manner as to assure that Ciccarelli receive [sic] the supplemental retirement benefits and other employment benefits to which he is legally and contractually entitled.

65. As a direct and proximate result of Union's wilful breach of fiduciary duties, Ciccarelli has suffered, continues to suffer, and will suffer in the future, extreme financial hardship.

Because the complaint invoked the idea of a breach of fiduciary duty, Union moved for summary judgment because the plan was a "top hat" plan and therefore not subject to the fiduciary duty provisions of ERISA. *Barrowclough v. Kidder, Peabody & Co., Inc.,* 752 F.2d 923, 934–35 (3d Cir.1985).

Union contends now that the focus of its discovery—which ended several months ago—was on the fiduciary-duty issue and whether the plan was a "top hat" plan. As such, it argues that it did not address the question of whether the benefits are due strictly under the terms of the contract.

It is true that the theories underlying fiduciary duty claims and § 1132(a)(1)(B) claims for benefits are distinct in ERISA. *See Anweiler v. American Electric Power Service Corporation,* 3 F.3d 986, 992 (7th Cir.1993);

---

**2.** As a clerical matter, we remind the parties that portions of depositions referred to in their briefs should be appended as exhibits. We have found instances in which that has not occurred.

*see also, Richards v. General Motors Corporation,* 850 F.Supp. 1325, 1331 (E.D.Mich. 1994). While we share to some degree Plaintiffs' conviction that Union has been aware of the true nature of Counts I and II for some time, we can not ignore the very real possibility that Union directed its energies in discovery toward the fiduciary-duty theory. Certainly, given the evidence offered by Union in support of its various motions, it is reasonable for Union to now assert that it focused its efforts on determining that the Union plan offered Plaintiffs was a "top hat" plan, given that "top hat" plans are not subject to several provisions of ERISA, including the fiduciary-duty requirements and the non-forfeiture provisions. *Barrowclough v. Kidder, Peabody & Co., Inc.,* 752 F.2d 923, 934–35 (3d Cir.1985) (fiduciary-duty provisions do not apply); *see United States v. Local 1804–1,* 812 F.Supp. 1303, 1332 (S.D.N.Y.1993) (non-forfeiture provisions do not apply).

■ As we noted in our most recent Memorandum and Order, in order for Counts I and II to survive, we would have to construe them liberally so as to find that they state claims under 29 U.S.C. § 1132(a)(1)(B), which *does* apply to "top hat" plans. Such a construction would be the functional equivalent of allowing an amendment of the pleading. As such, we looked toward the possibility of prejudice to Union, for "late pleading amendments are improper under [Fed. R.Civ.P. 15] if they cause substantial prejudice to the opposing party." *Consol. Data Terminals v. Applied Digital Data Systems,* 708 F.2d 385, 396 (9th Cir.1983).

It is late in the day. Discovery has been complete for several months. Trial is set to begin in less than a month. Defendant argues, convincingly, that a liberal construction of Counts I and II would require that we allow additional discovery and, perhaps, an additional motion for summary judgment. While doing so would, in some sense, cut the Gordian knot with which we are faced, such a course of action is not without its own prejudices to Union, namely with regard to time and money. Plaintiffs are well-represented by experienced counsel. They should have been aware as long as a year ago that Union

intended to rely on the fact that the plans are "top hat" plans and that knowledge should have served as a warning bell that the fiduciary-duty claims were subject to attack. While we bear in mind the admonition of the United States Court of Appeals for the Third Circuit in *Bixler v. Central Pennsylvania Teamsters Health–Welfare Fund,* 12 F.3d 1292, 1298 (3d Cir.1993), that we should construe ERISA cases with an eye toward the broad remedial goals of the statute, we must conclude in this case that the substantial prejudice that would be encountered by Union requires that we hold Plaintiffs to their chosen theory and that we grant summary judgment on Counts I and II.

## B. *The Woodend Affidavit*

■ On November 5, 1992, James Woodend, then the retired vice president of manufacturing for Gichner Systems Group, signed an affidavit that, *inter alia,* directly levelled charges of document falsification against both Plaintiffs.

At the time the affidavit was sworn to, Mr. Woodend was afflicted with serious pulmonary disease. Six months later, on May 4, 1993, Mr. Woodend died. The issue we address is whether the November 5, 1992 affidavit is admissible for use in the summary-judgment context or at trial. The relevant portions of the affidavit are in paragraphs 8, 9, and 10, and because the parties regard the affidavit as confidential it will suffice for us to refer to individual paragraphs.

Plaintiffs object to the admission of the affidavit because it is hearsay. Defendants do not dispute that the Woodend affidavit is hearsay and, indeed, they can not. The affidavit is an out-of-court declaration offered for the truth of the matter asserted. Fed. R.Evid. 802. Thus, to admit it, we must find that it falls within an exception. The parties have focused on the exception for statements against interest in Fed.R.Evid. 804(b)(3). We agree that this is the only exception likely to apply to the Woodend affidavit.

(b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\*      \*      \*      \*      \*      \*

(3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. . . .

The exceptions of Rule 804 apply only in cases in which the declarant is unavailable. For purposes of the rule, a declarant who has died is unavailable. Fed.R.Evid. 804(a)(4). The rationale behind the exception is that a person is unlikely to make a statement that is detrimental to his pecuniary or penal interests unless that statement is true. *See* Jack B. Weinstein, Weinstein's Evidence ¶ 804(b)(3)[01] (1994).

We believe it clear that certain of the assertions in the Woodend affidavit are statements against interest as contemplated by Fed.R.Evid. 804(b)(3). Mr. Woodend essentially admitted to actions that defrauded Raytheon; thus, he subjected himself at the very least to a suit by Raytheon and possible forfeiture of his Gichner pension. The issue here is not whether the affidavit contains statements against interest but just how wide a net the exception casts. Put more succinctly, does the exception render admissible only those portions of sentences that specifically inculpate Mr. Woodend or does it also include the remainders of those sentences, including references to others?

We believe the matter is resolved by a recent pronouncement of the Supreme Court of the United States. In *Williamson v. United States,* —— U.S. ——, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), the Court addressed the Fed.R.Evid. 804(b)(3) question in the context of a criminal case.[3] The Court, per Justice O'Connor, described the rationale for the statement-against-interest rule and wrote

This notion simply does not extend to the broader definition of "statement." The fact that a person is making a broadly self-

inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.

*Id.* at ——, 114 S.Ct. at 2435. In the lexicon of Rule 804(b)(3), statements that are not themselves self-inculpatory are termed "collateral." In *Williamson,* the Court held that "[w]e see no reason why collateral statements, even ones that are neutral as to interest, post [at ——, 114 S.Ct.], at 2432, should be treated any differently from other hearsay statements that are generally excluded." *Id.* at ——, 114 S.Ct. at 2435.

We could read *Williamson* in one of two ways. The first would be that, in a statement of several sentences, some of which are self-inculpatory and some of which are not, the sentences that are self-inculpatory are admissible—even if they contain non-self-inculpatory references—and the other sentences are not. As an example, in the following statement, the entire second sentence would be admissible under the rule but the first would not be: "Derek purchased the gun. Then, he and I robbed Kenneth." Under such a formulation, those sentences within the Woodend affidavit that implicate Mr. Woodend *and* Plaintiffs in wrongdoing would be admissible, with the references to Plaintiffs being, in some sense, *res gestae.*

The other way we could interpret *Williamson* is that only those words that are actually self-inculpatory fit within the Rule 804(b)(3) exception. Thus, a sentence that is generally self-inculpatory might have portions that are collateral and inadmissible. For example, in the following sentence, only the parts referring to culpable conduct by the declarant would be admissible: "Matthew, Derek, and I robbed Kenneth." The references to Matthew and Derek would have to be redacted. If this were the teaching of *Williamson,* any references in the Woodend affidavit to persons other than Mr. Woodend would be inadmissible.

---

**3.** We recognize the inherent differences between a criminal case and a civil case such as this, most particularly in the effect of the Confronta-

tion Clause. However, for purposes of this analysis, that distinction is of little moment.

For the reasons that follow, we believe the latter interpretation to be that intended by the Court.

First, the majority noted that the reason for the Rule 804(b)(3) exception is that a person who implicates himself is unlikely to be prevaricating. *Williamson, supra; see also, United States v. Palumbo*, 639 F.2d 123, 127 (3d Cir.1981). The Court held that this rationale can not extend to collateral statements that either inculpate or exculpate another person because the assertion about the third person lacks the same indicia of reliability. Given this holding, we can not conclude that the Court intended that the fortuity of sentence structure would dictate admissibility.[4] Thus, the fact that the self-inculpatory references in the Woodend affidavit are within the same sentences as the references that implicate Plaintiffs does not suggest that both types of statements fall within the Rule 804(b)(3) exception.[5]

4. To read *Williamson* otherwise would allow the illogical result that the reference to the third party in the first of the following examples would be admissible while that in the second would not be: (1) "Kenneth and I forged Derek's signature." (2) "I forged Derek's signature. Kenneth participated." Both collateral references to Kenneth lack the indicia of reliability underlying the rule.

5. We are further buttressed in this determination by the fact that affidavits, like Mr. Woodend's, are often written by attorneys fluent in the nuances of evidence law and then signed by the affiant. Indeed, Plaintiffs suggest that the Woodend affidavit was drafted by Gichner's counsel. We will not speculate about this. However, the mere possibility of an attorney drafter renders untenable an interpretation of *Williamson* that distinguishes between collateral statements within and without sentences. Our focus must properly be on the content of what is said or written rather than the form.

We have reviewed the response Gichner has filed to Plaintiffs' brief on the Woodend affidavit. There are two point in that brief that merit particular attention. First, Gichner points to an example in the *Williamson* majority opinion:

"Sam and I went to Joe's house" might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy.

—— U.S. at ——, 114 S.Ct. at 2437. While, at first blush, this example would seem to support the admission of similar sentences in the Woo-

Second, our holding is bolstered by several examples in the *Williamson* opinion. The majority responded to Justice Kennedy's concurrence, in which he argued that the majority formulation would eviscerate the exception, by noting several examples in which self-inculpatory statements could be used against third persons.

For instance, a declarant's squarely self-inculpatory confession—"yes, I killed X"—will likely be admissible under Rule 804(b)(3) against accomplices of his who are being tried under a co-conspirator liability theory. Likewise, by showing that the declarant knew something, a self-inculpatory statement can in some instances help the jury infer that his confederates knew it as well. And when seen with other evidence, an accomplice's self-inculpatory statement can inculpate the defendant directly: "I was robbing the bank on Friday morning," coupled with someone's testimony that the declarant and the de-

dend affidavit, we see a distinction. Viewed in the abstract, there is nothing at all self-inculpatory about "Sam and I went to Joe's house." It only becomes self-inculpatory in context; namely, with the added evidence that Sam and Joe are bad actors. In the Woodend affidavit, the statements are self-inculpatory without reference to Mr. LaCesa, Mr. Cline, and Mr. Ciccarelli. The addition of those names does not make the sentences any more self-inculpatory. The extra names are neutral as to Mr. Woodend's interest. Thus, the actually self-inculpatory parts can be excised from the statements. Put another way, in the Court's example, the self-inculpatory part of the statement is the admission that the declarant associated with Sam and Joe. Thus, evidence of that association bears the indicia of reliability underlying the Rule 804(b)(3) exception. In "Kenneth, Matthew, Derek, and I committed fraud," the self-inculpatory part is that the declarant committed fraud; the references to the third parties is superfluous.

Gichner also offers as an example from *Williamson* the following:

For example, if a lieutenant in an organized crime operation described the inner workings of an extortion and protection racket, naming some of the other actors and thereby inculpating himself in racketeering and/or conspiracy charges, I have no doubt that some of those remarks could be admitted as statements against penal interest.

*Id.* at ——, 114 S.Ct. at 2438. Gichner does not point out that this example comes from Justice Scalia's concurring opinion and does not, therefore, constitute the opinion of the Court.

fendant drove off together Friday morning, is evidence that the defendant also participated in the robbery.

*Williamson*, at ——, 114 S.Ct. at 2436 (citation omitted). All of the examples of permissible statements are ones in which only the declarant is implicated—none involve naming third parties.

Third, Justice Kennedy's concurrence seems to view the majority opinion as we have.

> I note finally that the Court's decision applies to statements against penal interest that exculpate the accused as well as to those that inculpate the accused. Thus, if the declarant said, "I robbed the store alone," only the portion of the statement in which the declarant said "I robbed the store" could be introduced by a criminal defendant on trial for the robbery.

*Id.* at ——, 114 S.Ct. at 2443 (Kennedy, J., concurring). The concurrence thus presumes that the majority rule would require editing within sentences.[6] Justice Kennedy further wrote that "[t]hough I would conclude that Rule 804(b)(3) allows admission of statements collateral to the precise words against interest, that conclusion of course does not answer the remaining question whether all collateral statements related to the statement against interest are admissible; ..." *Id.* at ——, 114 S.Ct. at 2443. The clear implication is that Justice Kennedy views the majority as finding the exception so narrow as to apply only to the particular words that are against the declarant's interest.[7]

Having determined that *Williamson* should be read narrowly, we apply its teaching to the Woodend affidavit.[8] Paragraph 8 of the affidavit purports to implicate Mr. Woodend, Plaintiffs, and another man in a plan to defraud Raytheon. According to *Williamson*, the only portions of that paragraph that are admissible are those that specifically refer to Mr. Woodend, not those that refer to any other persons. The same applies to paragraphs 9 and 10. Paragraph 11, in addition to the inherent hearsay problem, also appears to run afoul of Fed.R.Evid. 602's admonition that testimony should be based on personal knowledge. In sum, for purposes of the pending motions for summary judgment and trial, we will consider only those portions of the Woodend affidavit that describe potentially culpable conduct on Mr. Woodend's part.

1. *Plaintiffs' Motion for Summary Judgment on Union's First Amended Counterclaims*

The purpose of our inquiry into the Woodend affidavit was, at this stage, so that we might properly resolve Plaintiffs' motion for summary judgment against the first amended counterclaim of Union.

a. *Statutes of Limitations*

Plaintiffs argue that Counts VI, VII, VIII, IX, and X of Union's counterclaim must fall because they were brought outside the applicable statute of limitations. Those counts

---

**6.** Thus, if a sentence reads: "Kenneth and I robbed the bank," it would have to be edited to read "I robbed the bank." We have considered the possibility that the sentence could be presented to the jury as "Blank and I robbed the bank." However, the rationale of *Williamson* would suggest that even the reference to there being a third party lacks the reliability presumed by Rule 804(b)(3).

**7.** As Justice Kennedy notes, the commentators have split on the issue of the admissibility of collateral statements. Dean Wigmore suggested that "every fact contained in the same statement" should be admitted. 5 J. Wigmore § 1465 (3d Ed.1940). McCormick suggests that the collateral statement should be admitted if it is neutral with regard to the declarant's interest, as opposed to being self-serving (thus, the reference

to Kenneth in "I robbed the bank and Kenneth played a minor role" would be admissible but, in "I robbed the bank but it was Kenneth's idea," it would not be admissible). Edward W. Cleary, McCormick on Evidence § 279 (1984 and supp. 1987). The Advisory Committee notes to Fed. R.Evid. 804(b)(3) seem to follow McCormick.

**8.** We note in passing two other hearsay exceptions, the so-called residual exceptions in Fed. R.Evid. 803(24) and 804(b)(5). As have other courts, we view these residual exceptions as applying only in particularly compelling circumstances in which the hearsay is clearly trustworthy. *See United States v. Kim*, 595 F.2d 755, 765 (D.C.Cir.1979). We do not find those exceptional indicia of reliability in the Woodend affidavit. Indeed, Plaintiffs raise serious questions about the sincerity of the affidavit.

present claims of fraudulent misrepresentation, fraud, breach of fiduciary duties, and negligence, respectively.

The parties agree that the applicable Pennsylvania statute of limitations for each of these claims is two years. *See* 42 Pa.Cons.Stat.Ann. § 5524. For statute of limitations purposes, a claimant need only be put on inquiry notice by "storm warnings" of possible fraud. *In re Asbestos School Litigation,* No. 83–0268, 1991 WL 175848 at *3 (E.D.Pa. Sept. 4, 1991). The claimant must use all reasonable diligence to properly inform itself of the basis for its claim. *Id.* Union's counterclaims were filed on June 1, 1993, and, so, our inquiry is whether Union had sufficient "storm warnings" of fraud, negligence, or breach of fiduciary duty before June 1, 1991.

Plaintiffs offer several dates prior to June, 1991, by which it asserts Union had inquiry notice. For example, Plaintiffs point to a letter sent to Union by the DCAA on March 15, 1991, asking for clarification after the DCAA found "potential defective pricing" on the Patriot labor reports. *See* Letter of 3/15/91 from Ed Zaremski to Nicholas Gill. Further, Plaintiffs allege that Union was certainly on notice of alleged fraud by April 18, 1991, when Thomas Williamson, Esq., Gichner's counsel, informed Union's counsel, Eric Zahler, Esq., that false labor reports had been created with respect to the Raytheon/Patriot missile contracts. *See* Deposition of Charles Atwood at 120.[9]

We believe either the letter or the meeting would serve to provide Union with "storm warnings" that there might have been fraud. Because the Atwood testimony might well constitute inadmissible hearsay, we will rely on the letter alone. Inquiry notice, in the sense of statutes of limitations, is simply sufficient information to "awaken inquiry and direct diligence in the channel in which it would be successful." *Bohus v. Beloff,* 950 F.2d 919, 925 (3d Cir.1991), *quoting Deemer v. Weaver,* 324 Pa. 85, 90, 187 A. 215 (1936).

We recognize that the question of whether a claimant has exercised due diligence in discovering a cause of action is usually one for a jury. *Bohus, supra.* However, there is no dispute that Union officials received the March 15, 1991, letter from the DCAA describing potential pricing irregularities. Given that this fact is not disputed, we determine as a matter of law that the letter presented adequate "storm warnings" to Union that there might well be fraud. *See Pocono International Raceway v. Pocono Produce,* 503 Pa. 80, 468 A.2d 468, 471 (1983). As such, the counterclaims were filed more than two years after Union should have discovered the wrongdoing and we will dismiss Counts VI through X of Union's counterclaim as filed outside the applicable statute of limitations.

### b. *Cline Severance Agreement*

Plaintiffs move for summary judgment on Count IV of Union's first amended counterclaims because it is based on Mr. Cline's severance agreement, which Plaintiffs assert was rescinded. Union notes in its opposition brief that it does not object to dismissal of Count IV and, so, we will dismiss it.

### c. *Cline Pool Agreement*

On April 27, 1989, then-Union vice president Charles Atwood sent Mr. Cline, Mr. Woodend, and Mr. LaCesa a letter memorializing an agreement whereby the men would receive bonuses if Union sold the Gichner division for more than $50 million. *See* Exh. C to Plaintiffs' motion. The one-page letter sets no conditions on the bonuses, noting only that they would be based on the final purchase price with subsequent adjustments as might be called for in the sales agreement between Union and the purchaser.

Union asserts in its counterclaim that the pool agreement bonus given Mr. Cline should

---

9. Union refers to as hearsay the Atwood testimony, in which Mr. Atwood relates that Mr. Williamson told him that Mr. Williamson had told Union officials of the fraudulent labor reports. We agree. The Atwood testimony is offered for the truth of the matter asserted, namely that Mr. Williamson actually told Mr. Zahler about the false labor reports. As such, unless the testimony falls within an exception, it is inadmissible. Because the letter from DCAA would be sufficient, we need not resolve the hearsay problem regarding the Atwood testimony.

be returned because he allegedly engaged in fraud. Plaintiffs now argue that there is no evidence that Union suffered damages as a result of any violation of the pool agreement by Mr. Cline. Union responds that it might well have to reimburse Gichner and the federal government at the conclusion of the ongoing DCAA investigation and, so, under the pool agreement, the bonus might have to be adjusted downward.

We agree in large measure with Plaintiffs. Any damage to Union with regard to the pool agreement is speculative at best. Further, the pool agreement itself does not contain any provision that Union would not have to perform if Mr. Cline committed fraud, and we will not read in such a provision. Thus, the only rationale for Union's demanding a return of part of Mr. Cline's bonus would be that the final sale price was adjusted by Union's having to indemnify Gichner; that has not happened and Union can only speculate at this time that it will. We are advised that the DCAA investigation is continuing. Given the possibility that it could conclude before trial—and, therefore, that Union's argument will become more than speculation—we will not dismiss Count V of the counterclaim now. However, if there is no resolution by the DCAA by the time of trial, we will entertain a motion (without briefs) to dismiss Count V of the counterclaim for the reasons stated here.

### d. Civil RICO

■ Plaintiffs likewise seek summary judgment on Union's civil RICO counterclaim.

Union claims that Plaintiffs engaged in a pattern of fraud in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. Plaintiffs point to several elements of a RICO claim that they assert are unsupported in the record.

A RICO claim requires a pattern of conducting some sort of predicate offense; in this case, Defendant claims the predicate acts were instances of mail and wire fraud.

Plaintiffs argue that Union can point to no evidence in the record to demonstrate (1) that there was a pattern, (2) that any fraudulent documents were ever delivered to Raytheon by mail or wire, or (3) that Plaintiffs created the false documents or knowingly used them.

We will focus on just one aspect of Plaintiffs' argument; the question of whether the record reflects any direct evidence of fraud by Mr. Ciccarelli or Mr. Cline. Given our disposition regarding the Woodend affidavit, we must find that the record does not contain such direct evidence. Our review of Union's brief in opposition to Plaintiffs' motion suggests that the only portions of the record that Union points to with regard to actual fraud by Plaintiffs is the Woodend affidavit and the complaint in a Pennsylvania Human Relations Commission ("PHRC") action, *English v. Gichner.* The complaint is, of course, not evidence unto itself but, rather, a series of averments by another party.[10] Viewing the Woodend affidavit in light of *Williamson,* it too provides no direct evidence against Plaintiffs. Thus, Union can only establish that Mr. Woodend (and, perhaps, Mr. LaCesa) were involved in wrongdoing at Gichner. Union seeks to suggest, without record evidence, that Plaintiffs fall within the penumbra of the fraudulent activities. We can not agree that the record supports such a conclusion.

Indeed, Plaintiffs point to the deposition of Mr. Ciccarelli, who testified that the first notice that he had that there had been fraudulent labor reports prepared was at the Saturday meeting held in January, 1991—after the purported fraudulent activity ended and the DCAA investigation had begun. *See* Deposition of William Ciccarelli at 153. Mr. Cline testified to much the same thing. *See* Deposition of Donald Cline (Volume 2) at 748–49. Thus, we must find that Union has failed to create a triable issue of fact with regard to whether Plaintiffs either assisted in the preparation of false documents or knew about them prior to January, 1991. As

---

**10.** Given that a complaint to the PHRC is written by the complainant himself and is then notarized, we allow that we could view the *English* complaint as an affidavit. However, we have reviewed it and find that it contains no references at all to Plaintiffs; rather, it indicted Mr. LaCesa.

such, we believe that Plaintiffs have sustained their summary-judgment burden with regard to at least one crucial element of the RICO counterclaim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We will grant summary judgment on Counts I and II of Union's counterclaim.

III. *Conclusion*

With all pretrial motions now resolved, this case is ready for trial. If the parties mutually wish to discuss settlement prior to trial we would be willing to hold a conference to facilitate such discussions. Otherwise the Court will conduct a trial as scheduled.

*ORDER AND JUDGMENT*

AND NOW, this 6th day of September, 1994, upon consideration of the motions of the parties, it is ordered that:

1. Union's motion for summary judgment (filed March 1, 1994) is granted.

2. Plaintiffs' motion for summary judgment on Counts I and II (filed March 1, 1994) is denied.

3. Judgment on Counts I and II of plaintiffs' complaint is entered in favor of Union Corporation and against Plaintiffs.

4. Plaintiffs' motion for summary judgment as to Union Corporation's first amended counterclaims is granted in part.

5. Judgment is entered in favor of Plaintiffs and against the Union Corporation on Counts I, II, IV, and VI through X of Union Corporation's first amended counterclaims.

6. Plaintiffs' motion for summary judgment as to Union Corporation's first amended counterclaims is denied in all other respects.

7. By September 14, 1994, the parties shall submit a brief joint statement of their understanding of the issues that remain for trial.